COMPLAINT EXHIBIT 1

LOAN AGREEMENT

by and among

C & A FARMS, LLC, a California limited liability company; and
MARICOPA ORCHARDS, LLC, a California limited liability company
(collectively, "**Borrower**")

FARID ASSEMI, a married man;
FARSHID ASSEMI, a married man; and
DARIUS ASSEMI, a single man aka Dariush Assemi
(collectively, "**Guarantors**")

and

METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation
("**Lender**")

Dated as of April 2, 2021

$23,500,000.00

Loan No. 201755

1

LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**"), is made and entered into as of April 2, 2021 by and among C & A FARMS, LLC, a California limited liability company, MARICOPA ORCHARDS, LLC, a California limited liability company (individually and together, "**Borrower**"), FARID ASSEMI, a married man; FARSHID ASSEMI, a married man, DARIUS ASSEMI, a single man aka Dariush Assemi (collectively, "**Guarantors**" and individually "**Guarantor**"), and METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation ("**Lender**").

W I T N E S S E T H:

Borrower desires to obtain the Loan (as defined below) from Lender to finance the acquisition of certain property located in Fresno County, California, and Lender desires to make the Loan on the terms and conditions set forth herein and in the other Loan Documents. Capitalized terms used herein shall have the meanings assigned to them in Section 1 hereof.

NOW, THEREFORE, Borrower, Guarantors and Lender agree as follows:

SECTION 1.   DEFINITIONS.

For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

"**Affiliate**" means any Person which, directly or indirectly, controls or is controlled by or is under common control with Borrower or which beneficially owns or holds or has the power to direct the voting power of five percent (5%) or more of any membership interest of Borrower or which has five percent (5%) or more of its voting interests (or in the case of a Person which is not a corporation, five percent (5%) or more of its equity interest) beneficially owned or held, directly or indirectly, by Borrower.  For purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Borrower**" has the meaning specified in the first paragraph of this Agreement.

"**Business Day**" shall mean any day on which banks are required to be open to carry on their normal business in the State of New York.

"**Capital Lease**" means and includes at any time any lease of property, real or personal, which in accordance with GAAP would at such time be required to be capitalized on a balance sheet of the lessee.

"**Capital Lease Obligation**" means at any time the capitalized amount of the rental commitment under a Capital Lease which in accordance with GAAP would at such time be required to be shown on a balance sheet.

2

"**Closing Date**" has the meaning specified in <u>Section 2.2</u>.

"**Collateral**" means the Property, all property and assets, and proceeds thereof, described in, subjected, or intended to be subjected, at any time to the Liens of any of the Collateral Documents.

"**Collateral Documents**" has the meaning specified in <u>Section 2.3</u>.

"**Consolidated Current Assets**" means, as of the date of determination thereof, the aggregate of all assets which in accordance with GAAP would be so classified and appear as current assets on the consolidated balance sheet of Borrower, excluding any receivables from Borrower, Guarantors or Affiliates other than receivables from Touchstone Pistachio Company, LLC, a California limited liability company, which, for avoidance of doubt, may be included in the calculation of Consolidated Current Assets.

"**Consolidated Current Liabilities**" means, as of the date of determination thereof, the aggregate of all liabilities which in accordance with GAAP would be so classified and appear as current liabilities on the consolidated balance sheet of Borrower, excluding any payables to Borrower, Guarantors or Affiliates.

"**Consolidated Total Debt**" shall mean, as of the date of determination thereof, the sum of (1) liabilities for borrowed money, (2) liabilities for deferred purchase price of property (excluding accounts payable arising in the ordinary course of business), (3) Capital Lease Obligations, and (4) any guaranty with respect to liabilities of the type described in any of the clauses (1) through (3) hereof; less Subordinated Debt to Affiliates.

"**Deed of Trust**" has the meaning specified in <u>Section 2.3</u>.

"**Default Interest Rate**" means the lesser of (a) sixteen percent (16%) per annum, and (b) the maximum interest rate provided by law.

"**ERISA**" has the meaning specified in <u>Section 4.14</u>.

"**Events of Default**" has the meaning specified in <u>Section 11.1</u>.

"**GAAP**" means, as to a particular Person and at a particular time of determination, such accounting principles as, in the opinion of the independent public accountants regularly employed by such Person, conform at such time of determination to generally accepted accounting principles.

"**Guarantors**" and "**Guarantor**" has the meaning specified in the first paragraph of this Agreement.

"**Indebtedness**" shall mean (1) all indebtedness or obligations for borrowed money or which have been incurred in connection with the acquisition of property or assets, (2) indebtedness or obligations secured by or constituting any Lien existing on property owned by

the Person whose Indebtedness is being determined, whether or not the indebtedness or obligations secured thereby shall have been assumed, (3) Capitalized Lease Obligations, (4) guaranties and endorsements (other than endorsements for purposes of collection in the ordinary course of business), obligations to purchase goods or services for the purpose of supplying funds for the purchase or payment of, or measured by, indebtedness, liabilities or obligations of others and other contingent obligations in respect of, or to purchase or otherwise acquire or service, indebtedness, liabilities or obligations of others (whether or not representing money borrowed), (5) all liabilities in effect guaranteed by an agreement, contingent or otherwise, to make a loan, advance or capital contribution to or other investment in a Person for the purpose of assuring or maintaining a minimum equity, asset base, working capital or other balance sheet condition for any date, or to provide funds for the payment of any liability, dividend or stock liquidation payment, or otherwise to supply funds to or in any manner invest in such Person for such purpose, and (6) any mandatory redeemable preferred stock (including preferred stock the only mandatory redemption payment with respect to which is at maturity) of Borrower held by a Person other than such Borrower, at the higher of its voluntary or involuntary liquidation value. A renewal or extension of any Indebtedness without increase in the principal amount thereof shall not be deemed to be the incurrence of the Indebtedness so renewed or extended.

"**Indemnity Agreement**" has the meaning specified in Section 2.6.

"**Land**" means the real property subject to the Deed of Trust.

"**Lien**" means any mortgage, lien, pledge, security interest, encumbrance or charge of any kind, whether or not consensual, any conditional sale or other title retention agreement or any Capital Lease.

"**Loan**" has the meaning specified in Section 2.2.

"**Loan Documents**" means the Note and the Deed of Trust executed concurrently herewith together with this Agreement, the other Collateral Documents and all other documents and instruments evidencing, securing or otherwise relating to the Loan including, without limitation, any U.C.C. financing statements.

"**Net Worth Requirement**" means the collective net worth of Guarantors as of the Closing Date.

"**Note**" has the meaning specified in Section 2.1.

"**Permitted Encumbrances**" means those Liens and Leases described on Exhibit B to this Agreement.

"**Person**" includes an individual, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated organization or a government or any agency or political subdivision thereof.

"**Plan**" has the meaning specified in Section 4.14.

4

"**Property**" means that certain real property situated in Fresno County, California and more particularly described on <u>Exhibit A</u> attached hereto and incorporated by this reference.

"**Restricted Payments**" means dividends paid on capital stock or distributions with respect to membership interest (in either cash or property), and purchases or redemptions of capital stock or membership interest.

"**Subordinated Debt**" means any Debt owed to stockholders, subsidiaries or affiliates that is fully subordinated in right of payment and in respect of security in any respect to Debt evidence by the Note and any of the other Loan Documents.

"**Voting Interest**", as applied to the stock of any corporation, shall mean stock of any class or classes (however designated) having ordinary voting power for the election of a majority of the directors of such corporation other than stock having such power only by reason of the happening of a contingency.

All accounting terms used herein and not expressly defined in this Agreement shall have the meanings respectively given to them in accordance with GAAP as it exists at the date of applicability thereof.

SECTION 2.   <u>LOAN.</u>

2.1   <u>Authorization</u>.   Borrower has duly authorized the delivery of a promissory note dated of even date herewith and due on January 5, 2041, in the original principal amount of Twenty-Three Million Five Hundred Thousand and 00/100 Dollars ($23,500,000.00) (the "**Note**"). The interest rate applicable to the balance outstanding under the Note, the repayment terms and other terms applicable to the indebtedness evidenced by the Note are more particularly set forth therein.

2.2   <u>Loan; Closing</u>.   Borrower hereby agrees to borrow from Lender, and Lender, subject to the terms and conditions herein set forth and in the other Loan Documents, hereby agrees to lend to Borrower, the principal sum of Twenty-Three Million Five Hundred Thousand and 00/100 Dollars ($23,500,000.00) to be disbursed in accordance with this Agreement (the "**Loan**"). The date on which the Deed of Trust is duly recorded in Fresno County, California, shall be hereinafter referred to as the "**Closing Date**."

2.3   <u>Security</u>.   Payment of the Note and performance of the obligations arising under this Agreement and the Loan shall be secured by a Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing (the "**Deed of Trust**") encumbering the Property, dated of even date herewith and to be granted by Borrower, with respect to, <u>inter alia</u>, Borrower's orchard and farming operations and related crops, permanent plantings, irrigation facilities and water rights located on Borrower's fee estate in the Property and related assets, all as more particularly described in the Deed of Trust and such other documents and instruments as Lender shall reasonably request to further evidence or perfect its security interest in the Collateral. The Deed of Trust, assignments, security and pledge agreements, guarantees and all of the other documents entered into now or in the future in connection with the Loan shall each

be dated and delivered on the Closing Date and are collectively referred to herein as the "**Collateral Documents**."

      2.4    <u>Water Rights Collateral</u>.  The Collateral shall also include a first lien and security interest in all Water Rights (as defined in the Deed of Trust).

      2.5    <u>Guaranty and Pledge</u>.  Borrower's obligations under the Note, this Agreement and the other Loan Documents shall be guaranteed by Guarantors pursuant to Guaranty Agreements dated as of even date herewith.  The Note is also supported by a separate and independent Unsecured Indemnity Agreement by Borrower and Guarantors in favor of Lender (the "**Indemnity Agreement**").

<u>SECTION 3.</u>   <u>REPRESENTATIONS AND WARRANTIES</u>.

      Borrower represents and warrants that:

      3.1    <u>Financial Statements</u>.  Lender has been furnished with copies of consolidated balance sheets of Borrower, Guarantors and Affiliates of Borrower as of December 31, 2020, and related statements of cash flows and consolidated statements of operations, statements of stockholder's equity, and statements of cash flows of Borrower for the fiscal years ended on said dates. Such financial statements, including the related schedules and notes, are complete and correct and fairly present (a) the financial condition of Borrower, Guarantors and Affiliates as at the respective dates of said balance sheets and (b) the results of the operations and changes in financial position of Borrower, Guarantors and Affiliates for the fiscal years ended on said dates, all in conformity with generally accepted accounting principles applied on a consistent basis (except as otherwise stated therein or in the notes thereto) throughout the periods involved.

      3.2    <u>No Material Changes</u>.  There has been no material adverse change in the business, operations, properties, assets, prospects or condition, financial or other, of Borrower or Guarantors subsequent to the date of the aforesaid financial statements.

      3.3    <u>Liens</u>.  <u>Exhibit B</u> hereto correctly sets forth all Liens securing Indebtedness for money borrowed by Borrower existing on the date hereof, other than liens granted to Lender.

      3.4    <u>Licenses</u>.  Borrower possesses and shall continue to possess all trademarks, trade names, copyrights, patents, governmental licenses, franchises, certificates, consents, permits and approvals necessary to enable them to carry on their business in all material respects as now conducted and to own and operate the properties material to their business as now owned and operated, without known conflict with the rights of others.  All such trademarks, trade names, copyrights, patents, licenses, franchises, certificates, consents, permits and approvals which are material to the operations of Borrower, taken as a whole, are valid and subsisting.

      3.5    <u>Litigation</u>.  Except as set forth on Schedule 4.5, there are no actions, suits or proceedings (whether or not purportedly on behalf of Borrower or any of its members) pending or, to the knowledge of Borrower, threatened against or affecting Borrower or any of its members at law or in equity or before or by any federal, state, municipal or other governmental

department, commission, board, bureau, agency or instrumentality, domestic or foreign, or before any arbitrator of any kind, which involve any of the transactions herein contemplated or the possibility of any material and adverse change in the business, operations, properties, assets, prospects or condition, financial or other, of Borrower and its members; and neither Borrower nor any of its members is in default or violation of any law or any rule, regulation, judgment, order, writ, injunction, decree or award of any court, arbitrator or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which default or violation might have a material adverse effect on the business, operations, properties, prospects or condition, financial or other, of Borrower and its members, taken as a whole, and for which sufficient funds have been deposited in escrow to pay, in the event of an adverse judgment, all damages claimed thereunder.

3.6     Land Use Litigation.   There are no pending or, to the knowledge of Borrower, threatened proceedings or actions to revoke, attack, challenge the validity of, rescind or modify the zoning of the Land, the subdivision of the Land or any building, construction or other permits heretofore issued with respect thereto, or asserting such zoning, subdivision or permits do not permit the use and operation of the Property.   During the term of the Loan, Borrower shall promptly furnish Lender written notice of any litigation affecting or relating to Borrower, any Guarantor or the Property.

3.7     Condemnation.   Borrower has not received notice from any governmental or quasi-governmental body or agency or from any person or entity with respect to (and Borrower does not know of) any actual or threatened taking of the Land or any portion thereof, for any public or quasi-public purpose by the exercise of the right of condemnation or eminent domain.

3.8     Availability of Utilities.   All utility services necessary and sufficient for the Land and the Property, and the operation thereof for their intended purposes are available at the boundaries of the Land, including, without limitation, water, storm and sanitary sewer facilities, electric and telephone facilities, as applicable.

3.9     Access.   All roads necessary for the full utilization of the Property for its intended purpose have either been completed or the necessary rights-of-way therefor have either been acquired by the appropriate governmental authority or have been dedicated to the public use and accepted by such governmental authority, and all necessary steps have been taken by Borrower and such governmental authority to assure the complete construction, installation and acceptance thereof.   All portions of the Property have dedicated legal access, either directly or across other portions of the Property.

3.10   Leases.   There are no outstanding leases or agreements affecting the Property except as disclosed as Permitted Encumbrances.   Borrower will not enter into any lease or other agreement affecting any portion of the Property without first obtaining Lender's written consent, other than year-to-year leases for farming purposes, and any such lease or other agreement shall be subordinate, and at Lender's election, expressly subordinate to the lien of Lender's Deed of Trust except as otherwise permitted in the Deed of Trust.

7

3.11   <u>No Burdensome Provisions</u>.   Borrower is not a party to any agreement or instrument or subject to any charter or other corporate or legislative restriction or any judgment, order, writ, injunction, decree, award, rule or regulation which materially and adversely affects or in the future may materially and adversely affect the business, operations, properties, assets, prospects or condition, financial or other, of Borrower, taken as a whole.

3.12   <u>Compliance with Other Instruments</u>.   Borrower is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any bond, debenture, note or other evidence of Indebtedness of Borrower or contained in any instrument under or pursuant to which any thereof has been issued or made and delivered.   Neither the execution and delivery of this Agreement and the Loan Documents by Borrower, the consummation by Borrower of the transactions herein and therein contemplated, nor compliance by Borrower with the terms, conditions and provisions hereof and thereof and of the Note will violate any provision of law or rule or regulation thereunder or any order, injunction or decree of any court or other governmental body to which Borrower is a party or by which any term thereof is bound or conflict with or result in a breach of any of the terms, conditions or provisions of the articles of incorporation, corporate charter or bylaws of Borrower or of any agreement or instrument to which Borrower is a party or by which Borrower is bound, or constitute a default thereunder, or result in the creation or imposition of any Lien of any nature whatsoever upon any of the properties or assets of Borrower (other than the Liens created by the Collateral Documents).   No consent of the members of Borrower is required for the execution, delivery and performance of this Agreement, the Loan Documents or the Note by Borrower other than those delivered to Lender prior to the Closing, if any.

3.13   <u>Disclosure</u>.   Neither this Agreement, the Loan Documents nor any of the Exhibits hereto, nor any certificate or other data furnished to Lender in writing by or on behalf of Borrower in connection with the transactions contemplated by this Agreement contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein or therein not misleading.   To the best knowledge of Borrower, there is no fact which materially and adversely affects or in the future may materially and adversely affect the business, operations, properties, assets, prospects or condition, financial or other, of Borrower, taken as a whole, which has not been disclosed to Lender in writing.

3.14   <u>ERISA</u>.   Borrower represents, warrants and covenants that it is acting on its own behalf and that as of the date hereof, it is not an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, each of the foregoing hereinafter referred to collectively as a "Plan", and the assets of Borrower do not constitute "plan assets" of one or more such Plans within the meaning of Department of Labor Regulation Section 2510.3-101.   Borrower also represents, warrants and covenants that it will not be reconstituted as a Plan or as an entity whose assets constitute "plan assets."

3.15   <u>Tax Liability</u>.   Borrower has filed all tax returns which are required to be filed and have paid all taxes which have become due pursuant to such returns and all other taxes,

8

assessments, fees and other governmental charges upon Borrower and upon their properties, assets, income and franchises which have become due and payable by Borrower except those wherein the amount, applicability or validity are being contested by Borrower by appropriate proceedings in good faith and in respect of which adequate reserves have been established.

3.16   <u>Governmental Action</u>.  No action of, or filing with, any governmental or public body or authority is required to authorize, or is otherwise required in connection with, the execution, delivery and performance by Borrower of this Agreement, the Loan Documents or the Note (other than recordation of the Deed of Trust in the Office of the Recorder of Fresno County, California, and the filing of financing statements with respect to the Collateral in the Office of the Secretary of State of the State of California, all of which will have been duly recorded or filed on or prior to the Closing Date).

3.17   <u>Hazardous Waste</u>.  Neither the Property nor any portion thereof nor any other property owned or controlled at any time by Borrower has been or will be used by Borrower or any tenant of the Property or any portion thereof for the production, release, storage, handling or disposal of hazardous or toxic wastes or materials other than those pesticides, herbicides and other agricultural and commercial chemicals customarily used in agricultural and commercial operations of the type currently conducted by Borrower on the Property all of which have been and will be used in accordance with all applicable laws and regulations.

3.18   <u>Separate Property</u>.  The Property is taxed and billed separately from real property not subject to the Deed of Trust.

3.19   <u>No Affiliation</u>.  No director, officer, partner, manager, stockholder or member of Borrower is an officer or director of Lender or is a relative of an officer or director of Lender within the following categories:  a son, daughter or descendant of either; a stepson, stepdaughter, stepfather, stepmother; father, mother or ancestor of either, or a spouse.  It is expressly understood that for the purpose of determining any of the foregoing relationships, a legally adopted child of a person is considered a child of such person by blood.

3.20   <u>No Foreign Person</u>.  Neither Borrower nor any member or partner of Borrower is, and no legal or beneficial interest in a shareholder of Borrower is or will be held, directly or indirectly, by, a "foreign person" under the International Foreign Investment Survey Act of 1976, the Agricultural Foreign Investment Disclosure Act of 1978, the Foreign Investments in Real Property Tax Act of 1980, the amendments of such Acts or regulations promulgated pursuant to such Acts.  Borrower, and all persons holding directly or indirectly any beneficial interest in Borrower, have complied with all filing and reporting requirements of such Acts.  Neither Borrower, nor any actual or beneficial owner of Borrower, nor any intended recipient of the loan appears on the Specially Designated Nationals and Blocked Persons List (the "**SDN List**") as published by the Department of the Treasury of the United States, Office of Foreign Assets Control.

3.21   <u>Office of Foreign Asset Control</u>.  Borrower represents and warrants that neither Borrower nor any of its respective Affiliates is a Prohibited Person and Borrower and all of their

9

respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.  At all times throughout the term of the Loan, Borrower and all of its respective Affiliates shall: (i) not be a Prohibited Person (defined below); and (ii) be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control ("**OFAC**") of the U.S. Department of the Treasury.

The term "Prohibited Person" shall mean any person or entity:

     (a)    listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

     (b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive order.

     (c)    with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

     (d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

     (e)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, www.ustreas.gov/offices/enforcement/ofac, or at any replacement website or other replacement official publication of such list; or

     (f)    who is an Affiliate of or affiliated with a person or entity listed above; or

     (g)    who is a "disregarded entity" as defined in IRS Regulation 1.1445-2(b)(2)(iii).

The term "Affiliate," as used in this provision, shall mean as to any person or entity, any other person or entity that, directly or indirectly, is in control of, is controlled by or is under common control with such person or entity or is a director or officer of such person or entity or of an Affiliate of such person or entity.  As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.

    3.22   <u>Additional Representations and Warranties</u>.  As of the date hereof, the representations and warranties contained in Borrower's Closing Certificate executed by Borrower of even date herewith are true and correct.

10

3.23   Affiliate Debt.  As of the Closing Date, the only Indebtedness outstanding among Borrower, Guarantors or their respective Affiliates is as set forth in Exhibit C.

SECTION 4.   CONDITIONS PRECEDENT.

4.1   Conditions Precedent to Closing.  Lender's obligations hereunder shall be subject to the conditions precedent that Lender has received on or before the Closing Date in form and substance satisfactory to Lender's counsel, such assurances and evidence as Lender may require of the performance by Borrower of all its agreements to be performed hereunder, to the accuracy of its representations and warranties herein contained, and to the satisfaction, prior to the Closing Date or concurrently therewith, of the following further conditions:

(a)   Legality.  Lender shall be satisfied that the Note being issued to it on the Closing Date shall qualify on the Closing Date as a legal investment for life insurance companies under the New York Insurance Law (without resort to any provision of such law, such as Section 1405(a)(8) thereof, permitting limited investments by Lender without restriction as to the character of the particular investment) and such purchase shall not subject Lender to any penalty or other onerous condition under or pursuant to any applicable law or governmental regulation; and Lender shall have received such certificates or other evidence as Lender may reasonably request to establish compliance with this condition.

(b)   Proceedings.  All proceedings to be taken in connection with the transactions contemplated by this Agreement and the Loan Documents, and all documents incidental thereto, shall be satisfactory in form and substance to Lender; and Lender shall have received copies of all documents which Lender may reasonably request in connection with said transactions and copies of the records of all corporate proceedings in connection therewith in form and substance satisfactory to Lender.  Lender shall have received evidence of due formation, existence and authorization of this transaction by Borrower and Guarantors together with evidence of the authority of each signatory hereto.

(c)   Representations True; No Default.  The representations and warranties of Borrower in this Agreement and in the Loan Documents shall be true on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date; on the Closing Date no event which is, or with notice or lapse of time or both would be, an Event of Default shall have occurred and be continuing; and Lender shall have received a closing certificate, dated the Closing Date, of the managers, partners and officers, as applicable, of Borrower to each such effect.

(d)   Loan Documents.  Lender shall have received on the Closing Date fully executed original counterparts of each of the Loan Documents including all necessary consents.

(e)   Environmental Audit Results.  The results of any environmental audit of the Property required by Lender, and any remedial action required to be taken by Borrower as a result of such audit, are complete and satisfactory to Lender.

11

(f)      UCC Search.  Current Uniform Commercial Code searches made in the Office of the California Secretary of State on Borrower, showing no filings relating to the Property or Borrower other than those made hereunder and Permitted Encumbrances, and showing no filing which is objectionable to Lender.

(g)      Title Requirements.  Lender shall be furnished on the Closing Date with an ALTA loan policy (2006 Lender's Policy Form) of title insurance with respect to the Deed of Trust, issued to Lender by a title insurance company acceptable to Lender in the amount of the Loan insuring such Deed of Trust, as of the date of the disbursement of the Loan, to be a first and prior lien upon the Land, containing such endorsements and such co-insurance or re-insurance as Lender may request, and showing title to be subject to no matters other than those which may be approved, in writing, by Lender.

(h)      Other Closing Matters.    Lender shall have received such other documentation, assurances, certifications, estoppels and other materials confirming the satisfaction of all closing requirements set forth in the applications for the Loan submitted by Borrower and the terms of Lender's approval of such applications, as well as the satisfaction of all closing conditions set forth in Lender's instructions to the escrow agent handling the closing of the Loan.

SECTION 5.   FINANCIAL STATEMENTS; COMPLIANCE CERTIFICATES; ADDITIONAL INFORMATION; AND INSPECTION.

5.1      Financial Statements and Reports.  From and after the date hereof and so long as Lender (or a nominee designated by Lender) shall hold the Note, Borrower shall deliver to Lender:

(a)      as soon as practicable after the end of each fiscal year, and in any event within 150 days after the end of each fiscal year, the annual reviewed financial statements and related consolidated statements of earnings, equity and cash flows of Borrower, (and any successor or division thereof) and Affiliates conducting business in the agricultural industry, and Guarantors as of the end of and for such year, setting forth in each case in comparative form the corresponding figures of the previous fiscal year, all in reasonable detail, prepared in conformity with generally accepted accounting principles applied on a basis consistent with that of previous years (except as otherwise stated therein or in the notes thereto) certified by Borrower, stating that such financial statements present fairly the consolidated financial condition and results of operations and cash flows of Borrower and related entities and Guarantors in accordance with generally accepted accounting principles consistently applied (except for changes with which such accountants concur); provided, however, that all such financial statements and related reports shall be reviewed by an independent third party certified public accountant;

(b)      immediately upon a responsible manager, partner or officer of Borrower becoming aware of the existence of a condition, event or act which constitutes an Event of Default or an event of default under any other evidence of Indebtedness of Borrower including, without limitation, an event which, with notice or lapse of time or both, would constitute such an

12

Event of Default or event of default, a written notice specifying the nature and period of existence thereof and what action Borrower is taking or proposes to take with respect thereto; and

        (c)     such other information as to the business and properties of Borrower, including consolidating financial statements of Borrower (and any successor or division thereof) and Guarantors, and financial statements and other reports filed with any governmental department, bureau, commission or agency, as Lender may from time to time reasonably request.

     5.2    Inspection.  From and after the date hereof and so long as Lender (or a nominee designated by Lender) shall hold the Note, Lender shall have the right (i) to visit and inspect, at Lender's expense, any of the properties, all at such reasonable times and as often as Lender may reasonably request, of Borrower (including any property not owned by Borrower but upon which any security for the Loan may be located), to examine its books of account and to discuss the affairs, finances and accounts of Borrower and Guarantors with its and their members, officers and managers and independent public accountants, and (ii) to contact such third parties doing business with Borrower, and to engage in other auditing procedures as Lender deem reasonable to ensure the validity of Lender's security interests or the accuracy of Borrower's representations, warranties and certifications. In connection with such inspections, Lender and Lender's engineers, contractors and other representatives shall have the right to perform such environmental audits and other environmental examinations of the Property as Lender deem necessary or advisable from time to time.

     5.3    Water Adequacy.  Within thirty (30) days of Lender's request, Borrower shall deliver to Lender a report containing such information as may be requested by Lender to demonstrate the sources and amount of water supply available to each parcel of the Land during the coming crop year, including the number of irrigated acres, the confirmed supply available and the per acre foot cost of such supply.

## SECTION 6.   AFFIRMATIVE COVENANTS.

    Borrower covenant and agree that so long as the Note shall be outstanding:

     6.1    To Pay Indebtedness.  Borrower will punctually pay or cause to be paid the principal and interest (and prepayment premium, if any) to become due in respect of the Note according to the terms thereof and hereof (inclusive of any other permitted payments of which Borrower have notified Lender).

     6.2    Maintenance of Borrower Office.  Borrower will maintain an office at 1306 W. Herndon Avenue, Suite 101, Fresno, CA 93711 (or such other place in the United States of America as Borrower may designate in writing to the holder of the Note).

     6.3    To Keep Books.  Borrower and Guarantors will keep proper books of record and account in accordance with generally accepted accounting principles.

13

6.4    <u>Payment of Taxes; Corporate Existence; Maintenance of Properties</u>.   Borrower and Guarantors shall:

(a)    pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon it, its income or profits or its property before the same shall become in default, as well as all lawful claims and liabilities of any kind (including claims and liabilities for labor, materials and supplies) which, if unpaid, might by law become a Lien upon its property, except when contested in good faith, provided Borrower has posted a bond of not less than 100% of the claim or liability being contested with the governmental authority asserting the claim or liability.

(b)    do all things necessary to preserve and keep in full force and effect its corporate existence, rights (charter and statutory) and franchises; and

(c)    maintain and keep all its properties used or useful in the conduct of its business in good condition, repair and working order and supplied with all necessary equipment and make all necessary repairs, renewals, replacements, betterments and improvements thereof, except to the extent the same is obsolete, but in any event, as may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

6.5    <u>To Insure</u>.   Borrower shall (in addition to the insurance required to be maintained pursuant to the Deed of Trust):

(a)    keep all of its insurable properties owned by it insured against all risks usually insured against by persons operating like properties in the same geographical areas where the properties are located, all in amounts sufficient to prevent Borrower from becoming a coinsurer within the terms of the policies in question, but in any event in amounts not less than eighty percent (80%) of the then full replacement value thereof;

(b)    maintain public liability insurance against claims for personal injury, death or property damage suffered by others upon or in or about any premises occupied by it or occurring as a result of its maintenance or operation of any airplanes, automobiles, trucks or other vehicles or other facilities (including, but not limited to, any machinery used therein or thereon) or as the result of the use of products sold by it or services rendered by it;

(c)    maintain such other types of insurance with respect to its business as is usually carried by persons of comparable size engaged in the same or similar business and similarly situated; and

(d)    maintain all such worker's compensation or similar insurance as may be required under the laws of any State or jurisdiction in which it may be engaged in business.

All insurance for which provision has been made in <u>Section 7.5(b)</u> and <u>Section 7.5(c)</u> shall be maintained in at least such amounts as such insurance is usually carried by persons of comparable size engaged in the same or a similar business and similarly situated; and all insurance herein provided for shall be effected under a valid and enforceable policy or policies

14

issued by insurers of recognized responsibility, except that Borrower may effect worker's compensation or other similar insurance in respect of operations in any State or other jurisdiction either through an insurance fund operated by such State or other jurisdiction or by causing to be maintained a system or systems of self-insurance which are in accord with applicable laws.

6.6     <u>Continued Operations</u>.  Borrower shall continue, in at least substantially the same manner and degree as present, farming and orchard operations on the Property.  Borrower acknowledges that such continued operations constitute a significant inducement to Lender to make the Loan.

6.7     <u>Notice of Change of Status</u>.  Borrower agrees that it shall promptly notify Lender of the following:

(a)     if any assets of Borrower are surrendered in satisfaction of a debt or obligation;

(b)     if any existing farm operating entity or real estate ownership entity of Borrower is dissolved or any trust comprising Borrower is revoked or amended;

(c)     if the lease for any land currently leased by Borrower expires or is terminated; or

(d)     upon the commencement of any litigation, including any arbitration or mediation, and of any proceedings before any governmental agency which could materially and adversely affect the Property, Borrower, Guarantors or Lender.

<u>SECTION 7.</u>     <u>SUBSTANTIAL BENEFITS; CONSEQUENCES OF LOAN STRUCTURE.</u>

7.1     Borrower and Guarantors understand and agree that:

(a)     unless and to the extent otherwise released by Lender in writing, the Collateral pledged by Borrower will secure the entire amount of the Loan under the Note and the other Loan Documents;

(b)     except as otherwise stated in <u>Section 10</u>, Borrower will not be entitled to the release of Lender's security interest in any portion of the Collateral owned by Borrower until the entire Loan has been paid in full;

(c)     a result of the structure of the Loan is that all of the Collateral, regardless of the form by which it is encumbered or the ownership, shall now be security for the repayment of the Note and shall be available to satisfy the obligations incurred in connection with the Loan and of the Note;

(d)     a default by Borrower under the Note or the Loan Documents could result in the judicial or nonjudicial sale of some or all the Collateral for the Loan, and the application of the proceeds from such sale to complete or only partial satisfaction of the joint and several obligations of Borrower under the Note or the Loan Documents.

(e)     Due to the business among the entities comprising Borrower there is a community of interests among such entities such that the benefits of the Loan and the Note

15

evidencing the Loan flowing to one Borrower also benefits the other Borrower. The benefit of the Loan to each Borrower constitutes the reasonably equivalent value of the aggregate transfers made and the aggregate obligations incurred by each Borrower in connection with the Loan.

7.2     Intentionally Omitted.

7.3     The proceeds of the Loan will be used to fund the acquisition of the Property.

7.4     After diligent inquiry, Borrower has determined:

(a)     The interest rates and repayment terms of the Loan are more favorable than those any could have obtained without the pledge of each Borrower's ownership interest in the Property as collateral for the Loan and the joint and several liability of Borrower;

(b)     The relationship of the business operations conducted on the combined property encumbered by the Deed of Trust is such that the property in the aggregate is more valuable than the sum of each portion thereof owner by each Borrower, and separate financing of the parcels of Property owned by any Borrower would be uneconomical and inefficient.

7.5     Neither Borrower nor Guarantors is insolvent as of the date of this Agreement. Neither Borrower nor Guarantors will become insolvent as a result of the obligations incurred and transfers made in connection with the Loan. Neither Borrower nor Guarantor is, or is about to be, engaged in a business or transaction for which Borrower or Guarantor will have an unreasonably small amount of capital after the closing of the Loan. Neither Borrower nor Guarantor has incurred, or contemplates incurring, debts beyond such Borrower's or Guarantor's ability to pay as such debts become due.

7.6     The transfers made and obligations incurred by Borrower and Guarantors in connection with the Loan are not made with the intent to hinder, delay or defraud any person to which Borrower or any Guarantor was, is, or hereinafter will become, indebted.

7.7     To the extent any Borrower may be deemed a guarantor of any other Borrower's obligations to Lender, each such Borrower hereby waives (a) all rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to such guarantying Borrower (each Borrower, when acting in the capacity of a guarantor, being referred to in this Section as a "**Obligor**") or its successors by reason of Sections 2787 to 2855, inclusive, of the California Civil Code, as amended from time to time, (b) all rights and defenses with respect to its obligations under the Loan Documents by reason of any election of remedies by Lender or its successors in interest, (c) all rights and defenses arising from the alteration of the original obligations of the Loans or in the event the rights or remedies of the Lender against any Obligor are in any way impaired or suspended, and (d) all rights and defenses because the Notes are secured by real property, including, without limitation, any rights or defenses that are directly or indirectly based upon the application of Sections 580a, 580b, 580d or 726 of the California Code of Civil Procedure, as amended from time to time, to the Notes or any other obligation of any other Obligors. This waiver is specifically intended to apply to and incorporate all of the waivers permitted by Section 2856(a) of the California Civil Code. By executing this Agreement, and without impairing any other waiver herein, each Obligor acknowledges and agrees as follows:

16

(a)     Lender may collect any sums due or becoming due under the Loan Documents from any Guarantor or Obligor without first foreclosing on any real or personal property Collateral pledged by any Obligor as security for the Loans;

(b)     If Lender forecloses on any real property collateral pledged or encumbered as security for the Loans:

(i)     The outstanding amounts of the Loans may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price; and

(ii)     Lender may collect from Guarantors and Obligors even if Lender, by foreclosing on real property, has destroyed any right Guarantors or Obligors may have to collect from any other Obligors or Guarantors or any other party;

(c)     This Section is an unconditional and irrevocable waiver of any rights and defenses the Obligors may have because the Loans are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure; and

(d)     Each Obligor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Obligor's rights of subrogation and reimbursement against any other Obligor by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

SECTION 8.   RESTRICTIVE COVENANTS.

Borrower covenants and agrees that so long as the Note shall be outstanding:

8.1     Current Ratio; Working Capital.   Commencing at Closing and as of the end of each fiscal year thereafter, Borrower shall not permit the ratio of Consolidated Current Assets to Consolidated Current Liabilities at any time to be less than the ratio of 1.25 to 1.0, excluding for purposes of the calculation receivable and payables from or to Affiliates.

8.2     Restricted Payments.

(a)     Borrower will not, directly or indirectly, make any Restricted Payments or incur any liability to make any Restricted Payments, or make advances or loans to any member, unless immediately after giving effect to such action, there shall not exist any Event of Default or event which, with notice or lapse of time or both, would become an Event of Default.   All dividends, distributions, purchases, redemptions, retirements, acquisitions and payments made pursuant to this Section 8.2 in property other than cash shall be included for purposes of calculations pursuant to this Section 8.2 at the fair market value thereof (as determined in good faith by the manager of Borrower) at the time of declaration of such dividend or at the time of making such distribution, purchase, redemption, retirement, acquisition or payment.

(b)     Borrower's outstanding membership, partnership or other equity interests shall remain free and clear of any and all Liens at all times.

17

8.3     <u>Merger or Consolidation</u>.  Borrower will not consolidate with or merge into any Person, or permit any Person to merge into it, or sell, transfer or otherwise dispose of all or substantially all of its properties and assets.

8.4     <u>Transactions with Affiliates</u>.  Borrower will not engage in any transaction with an Affiliate on terms more favorable to the Affiliate than would have been obtainable in arm's length dealing in the ordinary course of business with a Person not an Affiliate.  Borrower hereby agrees that all Subordinate Debt or any inter-Borrower loans involving any one or more Borrower shall be subordinate in all respects to the Loan and no payment of any amounts owing in connection therewith at a time when an Event of Default exists may be made until the earlier of Lender's waiver of such Event of Default or the repayment in full of all amounts owing to Lender in connection with the Loan.  To the extent any amounts are received in any manner whatsoever in connection with such inter-Borrower loans by an obligee thereof during the period described in the immediately preceding sentence, such amounts shall be held in trust for and paid over to Lender until Lender is in receipt of all amounts owing to Lender in connection with the Loan. Upon the request of Lender, Borrower shall enter into a debt subordination agreement agreeable to Lender with respect to any Subordinated Debt.

8.5     <u>Maintain Organizational Existence</u>.  Borrower shall at all times maintain its existence as a limited liability company or corporation, as applicable, in the state of California and any other jurisdiction where it transacts business.  Absent Lender's prior written consent, Borrower will not change its name or jurisdiction of organization.

8.6     <u>Transfers and Encumbrances</u>.  Borrower shall not assign, transfer, convey, encumber or hypothecate any of its direct or indirect interest in any of the Collateral or of any interest in Borrower absent Lender's prior written consent which may be withheld or conditioned in Lender's sole and absolute discretion, except as expressly permitted in the Deed of Trust or in <u>Section 10</u> hereof.  Upon the written request of Borrower, Lender will subordinate its interest in crops growing or to be grown on the Property and all governmental payments relating to such crops (the "**Crops**"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "**Crop Lender**") for one or more loans made to Borrower to finance the production of Crops on all or any portion of the Property ("**Operating Financing**"), upon the satisfaction of each of the following conditions in Lender's sole and absolute discretion:

(a)     no Event of Default exists under the Note, the Deed of Trust, the Collateral Documents or any other documents executed to evidence or secure the Loan nor does any event exist which with the giving of notice or the passage of time or both would constitute an Event of Default;

(b)     Borrower has provided Lender with pro forma cash flow projections demonstrating to Lender's reasonable satisfaction that the amount of the Operating Financing will not render the security for the Loan inadequate or impair Borrower's ability to pay and perform its obligations under the Loan, together with copies of all documents prepared to evidence or secure the Operating Financing;

(c)     no outstanding lien remains for an Operating Financing for which Lender has previously subordinated;

18

(d)     any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances;

(e)     under no circumstances will the subordination of Lender's security interest in Crops extend to Crops produced on the Property after the harvest of any Crops growing at the time of transfer of title to the Property pursuant to judicial or non-judicial foreclosure of the Deed of Trust; and

(f)     any default under the Operating Financing shall constitute an Event of Default under this Agreement, the Note, and the Deed of Trust.

SECTION 9.   PARTIAL RELEASE/ORDINARY COURSE ENCUMBRANCES.

9.1     <u>Partial Release</u>.  Borrower may request Lender to release one or more parcels of Land, from time to time, from the lien of the Deed of Trust or the Related Deeds of Trust (the "**Partial Release**") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the following terms and conditions:

(a)     <u>Request</u>.  Borrower shall submit a formal written request for the Partial Release (the "**Request**") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "**Release Parcel**"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release, including without limitation an updated title report covering the Property and, at Lender's request, a boundary survey of the applicable portion of the Property prepared by a licensed surveyor, and if such information is not included in the request, the processing of the Request will be delayed accordingly.

(b)     <u>No Default</u>.  No Event of Default shall exist under any of the Loan Documents, either at the time of the Request or at the closing of the Partial Release, and the Partial Release will not cause an Event of Default under any of the Loan Documents. No material adverse change has occurred with respect to the financial condition of any of the Borrower or Guarantors since the Closing Date.

(c)     <u>Title Endorsement</u>. Borrower shall provide, at Borrower's sole expense, a title insurance endorsement which insures the continued same priority lien of the Deed of Trust on the Property remaining after the Partial Release (the "**Remaining Property**"), and which insures that the Remaining Property is comprised of separate legal lot or lots, has legally enforceable access rights and is comprised of contiguous parcels.

(d)     <u>Costs and Expenses</u>. Borrower shall pay all of Lender's outside counsel fees and other costs, including title, escrow or appraisal costs, if any, in processing and documenting the Partial Release (including any necessary amendments to the Loan Documents and title endorsement premiums), and Lender's customary service fee.

19

(e)     Written Consent. The written consent to the Partial Release of all Guarantors and the holders of any permitted junior liens, encumbrances or lessees shall be obtained prior to the Partial Release.

(f)     Legal Compliance. Borrower shall create any easements, covenants or restrictions required by Lender in order to ensure the continued compliance of the Remaining Property with legal or lease requirements.

(g)     Independence of Remaining Property.  Borrower, at their sole cost and expense, shall provide updated boundary surveys showing any new easements created for the benefit of the Remaining Property (with the parcel to be released and the Remaining Property consisting of separate and independent tax parcels approved by the responsible taxing authority), and such other information or reports as Lender may require to document that there has been no other impairment to the use and operation of the Remaining Property.

(h)     Functionality. The Remaining Property must have legal, insurable access for ingress, egress, water conveyance and functionality and meet all applicable legal requirements following the Partial Release.  The release of the Release Parcel shall not otherwise impair the use, functionality or value of the Remaining Property (i.e. it shall not include improvements, wells, pumps, motors, irrigation equipment, water rights or other items necessary for the continued operation of the Remaining Property nor render the farming or other use of the Remaining Property inefficient or more costly).  The Partial Release shall not otherwise adversely impact the farming or orchard operations, water supply or the overall loan to value in effect at the origination of the Loan, as determined by the Lender in its sole discretion.

(i)     Proceeds of Release.  Subject to an open-land sale for solar development as provided below, Lender may require, as a condition to any Partial Release, a payment reflecting the reduction in collateral value of the Remaining Property for application to the Loan or the pledge of additional collateral, as determined in Lender's sole discretion.  At Lender's request updated appraisals of the Remaining Property shall be obtained at Borrower's cost to support the related analysis.  Any applicable prepayment premium under the terms of the Note shall also be paid to Lender.  Borrower shall also have the right to require updated appraisals of the Remaining Property to support the necessary valuation, at Borrower's cost.

(j)     Application of Prepayment Proceeds.  The Partial Release payment shall be applied first to the applicable prepayment premium calculated in accordance with the Note, if any, with respect to the principal reduction of the Loan and then to the principal balance of the Loan.  No Partial Release or prepayment shall affect the regularly scheduled installments of principal and interest then due under the Note.  Lender shall not be obligated to make any additional disbursements under this Loan Agreement while any Request for Partial Release is pending.

9.2     Encumbrances of Property in the Ordinary Course.  Notwithstanding any provision of the Loan Documents to the contrary, Borrower shall have the right to enter into any of the following transactions that are in the ordinary course of business of an owner and operator

20

of agricultural properties in the Central Valley of California with respect to the Property under the conditions set forth below:

(a)      Enter into leases with respect to any portion of the Property for its intended farming or other related purposes with an Affiliate, so long as such lease is subordinate to the Deed of Trust, does not impair the Water Rights or other attributes of any portion of the Property and a copy of the related lease is provided to Lender consistent with the final paragraph of this Section 9.2;

(b)      Grant easements encumbering portions of the Property to third parties for purposes of facilitating access for neighboring properties, for traversing the property with transmission lines, underground pipeline for the transportation of water or oil and gas or for other ordinary and customary purposes compatible in all respects with a farming operation on the Property of a scope and nature in existence as of the date of this Agreement, so long in each instance:

(i)      the easement is subordinate to the Deed of Trust unless otherwise expressly agreed in writing by Lender;

(ii)      the easement does not contain any environmental indemnities by the landowner or other indemnities outside the ordinary course or otherwise materially expose the owner of the Property to contractual liability;

(iii)      the easement shall not impair the use or functionality of the Property (i.e. it shall not preclude or impair access to improvements, wells, pumps, motors, irrigation equipment, Water Rights or other items necessary for the continued operation of the Property nor render the farming or other use of the Property inefficient or more costly) or materially impair the value of the Property.  The easement shall not otherwise materially adversely impact the farming or orchard operations, water supply or the overall loan to value in effect at the origination of the Loan, as determined by Lender in its sole discretion.

At least annually, but in any event upon request by Lender (which in the absence of a default shall not occur more than once per calendar year), Borrower shall provide Lender with a summary of all transactions completed pursuant to the rights contained in this Section 9.1 including the affected portion of the Property, the grantee of the applicable rights and a copy of the related documentation.

SECTION 10. DEFAULTS AND REMEDIES.

10.1      Events of Default; Acceleration.  The occurrence of one or more of the following events (herein called "**Events of Default**" and singularly, an "**Event of Default**") shall constitute an Event of Default under this Agreement (and whether such occurrence shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)      The failure of Borrower to pay any installment of principal, interest or principal and interest, any required escrow deposit or any other sum required to be paid under

21

this Agreement, the Notes or any other Loan Document, whether to Lender or otherwise, on or before the due date of such payment; or

(b)      default in the performance or observance of any other covenant, agreement or condition contained herein, in the Note or the Deed of Trust within thirty (30) days after receipt of written notice from Lender specifying the nature of the default, provided however, if such default cannot be cured within the 30-day period, then so long as Borrower has commenced and diligently pursues the cure of the related default, within ninety (90) days following receipt of written notice, and further provided that no notice of default or opportunity for cure shall be required if during the prior twelve (12) months, Lender has already sent a notice to Borrower identifying Borrower's default in performance of the same obligation; or

(c)      any Event of Default under the Deed of Trust or any Default or event of Default under any Collateral Document, or Loan Document (following the expiration of any applicable cure period) shall occur; or

(d)      Borrower shall not pay when due, whether by acceleration or otherwise, any evidence of indebtedness of Borrower (other than the Note), or any condition or default shall exist under any such evidence of indebtedness or under any agreement under which the same may have been issued permitting such evidence of indebtedness to become or be declared due prior to the stated maturity thereof, and the expiration of any applicable cure period, except to the extent Borrower is disputing the same in good faith and has posted a bond or surety satisfactory to Lender in an amount not less than 100% of the disputed amount; or

(e)      Borrower or any Guarantor shall file a petition seeking relief for itself under Title 11 of the United States Code, as now constituted or hereafter amended, or an answer consenting to, admitting the material allegations of or otherwise not controverting, or shall fail to timely controvert, a petition filed against Borrower or any Guarantor seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended; or Borrower or any Guarantor shall file such a petition or answer with respect to relief under the provisions of any other now existing or future bankruptcy, insolvency or other similar law of the United States of America or any State thereof or of any other country or jurisdiction providing for the reorganization, winding-up or liquidation of corporations or an arrangement, composition, extension or adjustment with creditors; or

(f)      a court of competent jurisdiction shall enter an order for relief which is not stayed within sixty (60) days from the date of entry thereof against Borrower or any Guarantor under Title 11 of the United States Code, as now constituted or hereafter amended; or there shall be entered an order, judgment or decree by operation of law or by a court having jurisdiction in the premises which is not stayed within sixty (60) days from the date of entry thereof adjudging Borrower or any Guarantor as bankrupt or insolvent, or ordering relief against Borrower or Guarantors, or approving as properly filed a petition seeking relief against Borrower or Guarantors, under the provisions of any other now existing or future bankruptcy, insolvency or other similar law of the United States of America or any State thereof or of any other country or jurisdiction providing for the reorganization, winding-up or liquidation of corporations or an arrangement, composition, extension or adjustment with creditors, or appointing a receiver, liquidator, assignee, sequestrator, trustee, custodian or similar official of Borrower or any

22

Guarantor or of any substantial part of its property, or ordering the reorganization, winding-up or liquidation of its affairs; or any involuntary petition against Borrower or any Guarantor seeking any of the relief specified in this clause shall not be dismissed within sixty (60) days of its filing; or

(g)     Borrower or any Guarantor shall make a general assignment for the benefit of its creditors; or Borrower or any Guarantor shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, sequestrator, trustee, custodian or similar official of Borrower or any Guarantor or of all or any substantial part of its property; or Borrower or any Guarantor shall have admitted to its insolvency or inability to pay, or shall have failed to pay its debts generally as such debts become due; or Borrower or any Guarantor or its trustees, directors or members shall take any action to dissolve or liquidate Borrower or Guarantor; or

(h)     Borrower or any Guarantor shall (1) engage in any non-exempted "prohibited transaction," as defined in Sections 406 and 408 of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, (2) incur any "accumulated funding deficiency," as defined in Section 302 of ERISA, in an amount in excess of Ten Thousand and 00/100 Dollars ($10,000.00), whether or not waived, or (3) terminate or permit the termination of an "employee pension benefit plan," as defined in Section 3 of ERISA, in a manner which could result in the imposition of a Lien on any property of Borrower or any Guarantor pursuant to Section 4068 of ERISA securing an amount in excess of Ten Thousand and 00/100 Dollars ($10,000.00); or

(i)     any representation or warranty made by Borrower in Section 4 hereof or in any Collateral Document or in any certificate or instrument furnished in connection therewith shall prove to have been false or misleading in any material respect as of the date made, provided that Borrower shall have ten (10) days following the written identification by Lender of the related misrepresentation or breach of warranty to cure the related misrepresentation if unintentional and if Lender is thereby placed in the same risk position as if the misrepresentation had not been made; or

(j)     the Collateral or any portion thereof is sold, conveyed, transferred, assigned or disposed of, or the Property is rezoned, either voluntarily or involuntarily, or an agreement for any of the foregoing is entered into, other than transfers permitted under the Loan Documents; or

(k)     the dissolution or death of Borrower or any Guarantor, whether by operation of law or otherwise; provided, however, that the death of a Guarantor will not be an Event of Default under this Agreement if any remaining Guarantor(s) collectively meet the Net Worth Requirement and at least two of the original Guarantor remain Guarantor with legal control of the Property.  If the remaining Guarantor(s) collectively fail to meet the Net Worth Requirement, then the death of any Guarantor shall not be an Event of Default so long as Borrower or remaining Guarantor(s), within one hundred twenty (120) days of the subject event, cause another person or persons to assume the obligations of the deceased Guarantor under the Guaranty and the Indemnity Agreement, so that Guarantor (including any new Guarantor(s))

23

collectively meet the Net Worth Requirement and Guarantor have legal control over the Property. For purposes hereof, "legal control" shall mean the power, either directly or indirectly, to exercise the authority of Borrower as owner of the Property, either as the majority shareholder of the common stock of a corporation, trustee of a trust, the sole general partner of a limited partnership, the managing general partner of a general partnership, or the manager or managing member of a limited liability company. In either case, Lender shall be promptly advised of the event of death.

Upon an Event of Default, at Lender's option, the entire outstanding principal amount of the Note, together with accrued interest thereon at the Default Interest Rate, shall immediately become due and payable without notice or demand. In the event that a tender of the foregoing sum is received at a time when a prepayment premium would otherwise apply or prepayment would be prohibited under the Note, such tender shall be deemed to be a voluntary prepayment under the Note, and in addition to principal and interest due as aforesaid, Borrower agrees to pay the prepayment price, computed as provided in the Note (except that, for purposes of such computation, the prepayment date shall be deemed to be the date upon which the holder of the Note shall have declared the Note to be due and payable).

BORROWER EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 2954.10 TO PREPAY THE NOTE, IN WHOLE OR IN PART, WITHOUT FEE OR PENALTY, UPON ACCELERATION OF THE MATURITY DATE OF THE NOTE, AND (B) AGREES THAT IF, FOR ANY REASON, A PREPAYMENT OF THE NOTE IS MADE, UPON OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE OF THE NOTE BY THE HOLDER THEREOF ON ACCOUNT OF ANY DEFAULT BY BORROWER UNDER ANY LOAN DOCUMENT, INCLUDING BUT NOT LIMITED TO ANY TRANSFER, FURTHER ENCUMBRANCE OR DISPOSITION WHICH IS PROHIBITED OR RESTRICTED BY THE DEED OF TRUST, THEN BORROWER SHALL BE OBLIGATED TO PAY CONCURRENTLY THE PREPAYMENT FEE SPECIFIED IN THE NOTE (IF APPLICABLE). BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER AGREES THAT LENDER'S AGREEMENT TO MAKE THE LOAN AT INTEREST RATE AND FOR THE TERM SET FORTH IN THE NOTE AND THIS AGREEMENT CONSTITUTES ADEQUATE CONSIDERATION FOR THIS WAIVER AND AGREEMENT.

INITIALS OF AUTHORIZED SIGNATORY OF BORROWER:

10.2   Remedies Upon Default.   In case an Event of Default shall occur and be continuing, the holder of the Note may proceed to protect and enforce its rights by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant contained in the Note, this Agreement, or any Loan Document, or in aid of the exercise

24

of any power granted in the Note, this Agreement, or in any Loan Document or may proceed to enforce the payment of the Note, or to enforce any other legal or equitable right of the holder of the Note including without limitation, taking of the following actions, concurrently or successively, without notice to Borrower.  Borrower agrees that its obligations under the Note are of the essence, and upon application to any court of equity having jurisdiction in the premises, a decree against Borrower requiring specific performance of such obligations.

       (a)     Declare the Note to be, and the Note shall thereupon become, immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in the Note to the contrary notwithstanding; or

       (b)     Enter upon and take possession of the Property and all material, equipment and supplies thereon and water rights available thereto and to fulfill the obligations of Borrower hereunder and to sell, manage, repair, and protect the Property.  Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution, (i) to pay, settle or compromise all existing bills and claims which may be liens or security interests against the Property or any fixtures or equipment thereon, or as may be necessary or desirable for the clearance of title or otherwise, and (ii) to use any funds of Borrower, including any Loan balance which might not have been disbursed.

    10.3    <u>Remedies Not Waived</u>.  No course of dealing between the holder of the Note and Borrower or any delay or failure on the part of the holder in exercising any rights under the Note, any Loan Document or hereunder shall operate as a waiver of any rights of such holder.

    10.4    <u>Remedies Cumulative</u>.  No remedy herein or in the Note or in any Loan Document conferred upon the holder of the Note is intended to be exclusive of any other remedy and each and every remedy shall be in addition to every other remedy given hereunder or under the Note or under any Loan Document, or now or hereafter existing at law or in equity or by statute or otherwise.

    10.5    <u>Costs and Expenses</u>.  Borrower shall pay to the holder of the Note, to the extent permitted under applicable law, all reasonable out-of-pocket expenses incurred by such holder as shall be sufficient to cover the cost and expense of enforcing such holder's rights under the Note, and any Loan Document or the collecting and foreclosing upon, or otherwise dealing with, the Collateral, or participating in any litigation or bankruptcy proceeding for the protection or enforcement of the holder's collateral or claim against Borrower or any Guarantor of the Note or otherwise incurred in connection with the occurrence of an Event of Default, said expenses to include reasonable compensation to the attorneys and counsel of such holder for any services rendered in that connection, upon the Note held by such holder.

<u>SECTION 11.</u> <u>MISCELLANEOUS</u>.

25

11.1    <u>Loss or Damage</u>. In case of loss or damage by fire or otherwise to the Property or any part thereof, Borrower will forthwith notify Lender of same and Lender may make proof of such loss if the same is not promptly made by Borrower or if Lender deem it desirable to do so. Lender is authorized to adjust, collect, and compromise, in its reasonable discretion, all claims under insurance policies covering the loss in question. All insurance proceeds shall be paid directly and solely to Lender and each insurance company is authorized and directed to make such payment directly and solely to Lender, and the insurance policies shall so stipulate. All insurance proceeds may, subject to the sentence immediately below, be applied either to the reduction of the indebtedness under this Agreement or to the restoration, repair, replacement or rebuilding of the portion of the Property so damaged in such manner as Lender may determine, and any application thereof to the indebtedness shall not release or relieve Borrower from making the payments or performing the other agreements and obligations herein required until the indebtedness is paid in full. If and only so long as no Event of Default has occurred and is continuing hereunder and provided that the insurance proceeds, when combined with the portion of this Loan not yet disbursed, are sufficient in Lender's judgment, after first deducting and paying the expenses, if any, incurred by Lender in the collection of the proceeds of the insurance, to otherwise pay all costs and expenses relating thereto and to the Loan (including the payment of interest and other carrying costs) or if such proceeds are not sufficient as above provided, provided that Borrower deposits with Lender, the amount of such deficiency, as determined by Lender within ten (10) Business Days of demand therefor and further provided that the insurance Borrower shall not claim that, notwithstanding such payment to Lender, it had no liability to pay any or some portion of such proceeds to Borrower, then the balance of the proceeds, plus any amounts deposited by Borrower, will be held and disbursed by Lender, from time to time, for the purpose of the repair, restoration, building or rebuilding of the Property in accordance with such procedures as may be established by Lender.

11.2    <u>Assignment by Lender</u>. Lender may assign, negotiate, pledge or otherwise hypothecate all or any portion of this Agreement or grant participations herein, or in any of its rights and security hereunder, including, without limitation, the Note and the Loan Documents and, in the case of such assignment, Borrower will accord full recognition thereto and agree that all rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by such assignee with the same force and effect and to the same extent as the same would have been enforceable by Lender but for such assignment provided that in connection with any such assignment Lender shall give Borrower at least sixty (60) days prior written notice of such assignment and such assignee agrees to be bound by the terms and provisions hereof.

Borrower shall not assign or attempt to assign any of its rights under this Agreement, either voluntarily or by operation of law.

11.3    <u>Time is of the Essence</u>. Time is of the essence of this Agreement.

11.4    <u>No Waiver</u>. No waiver of any term, provision, condition, covenant, or agreement herein contained shall be effective unless set forth in a writing signed by Lender, and any such waiver shall be effective only to the extent set forth in such writing. No failure by Lender to

26

exercise, or delay by Lender in exercising, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement are cumulative and not exclusive of any right or remedy provided by law. No notice or demand on Borrower in any case shall, in itself, entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

11.5    No Joint Venture.  Nothing herein, in the Note, the Loan Documents, or in any other Loan Document contained, and no action or inaction whatsoever on the part of Lender, shall be deemed to make Lender a partner or joint venturer with Borrower and Borrower shall protect, defend, indemnify and hold Lender harmless from and against all claims, loss, cost, expense (including attorneys' fees) and damages arising from the relationship between Lender and Borrower being construed or alleged to be as anything other than that of secured lender and borrower.

11.6    Entire Agreement.  This Agreement and the attached Exhibits hereto and the other documents referred to herein constitute the entire agreement between the parties hereto and may not be modified or amended in any manner other than by supplemental written agreement executed by the parties hereto.

11.7    Severability; Consistency.  If any provision of this Agreement or the application thereof to any person or situation shall, to any extent, be held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to persons or situations other than those to which it shall have been held invalid or unenforceable, shall not be affected thereby, but shall continue valid and enforceable to the fullest extent permitted by law. The Loan Documents are intended to be consistent with each other and should be interpreted to such effect.

11.8    Agreement Not to Benefit Third Parties.  This Agreement is made for the sole benefit of Borrower and Lender, and no other person shall be deemed to have any privity of contract hereunder nor any right to rely hereon to any extent for any purpose whatsoever, nor have any right of action of any kind hereon nor be deemed to be a third party beneficiary hereunder.

11.9    No Documents to be Recorded.  Borrower covenants that it will not cause or permit any document or instrument to be placed of record with respect to the Land or the Property without Lender's prior written consent.

11.10   Loss, Theft, Destruction or Mutilation of Note.  Upon receipt of evidence satisfactory to Borrower of the loss, theft, destruction or mutilation of the Note, and, in the case of any such loss, theft or destruction, upon receipt of a bond of indemnity reasonably satisfactory to Borrower or, in the case of any such mutilation, upon surrender and cancellation of such Note, Borrower will make and deliver, in lieu of such lost, stolen, destroyed or mutilated Note, a new

Note(s) of like tenor and unpaid principal amount and dated the date of, or, if later, the date to which interest has been paid on, the lost, stolen, destroyed or mutilated Note.

11.11  Expenses.  In addition to the loan fee previously paid to Lender Borrower shall pay all costs of closing the Loan and all of Lender's expenses with respect thereto, including but not limited to, legal fees, disbursements and travel expenses of counsel for Lender (including legal fees incurred by Lender subsequent to the closing of the Loan in connection with the administration, collection or transfer of the Loan); all recording fees and charges; title insurance premiums and costs, escrow and funding charges; surveys; intangible taxes; environmental assessments; expenses of foreclosure (including trustee's and attorney's fees); and similar items. Borrower's obligations under this Section 12.11 shall survive the payment or prepayment of the Note.

11.12  Stamp Taxes, Recording Fees, etc.  Borrower shall pay, and save Lender and any subsequent holder of the Note harmless against, any and all liability (including any interest or penalty for non-payment or delay in payment) with respect to stamp and other taxes (other than any such stamp or other taxes incurred upon a transfer of the Note by Lender), if any, and all recording and filing fees which may be payable or determined to be payable in connection with the transactions contemplated by this Agreement and the Loan Documents, including, without limitation, the issuance and delivery of the Note, the execution, delivery, filing and recording of the Loan Documents and financing statements related thereto, or any modification, amendment or alteration thereof.  The obligations of Borrower under this Section 12.12 shall survive the payment or prepayment of the Note.

11.13  Successors and Assigns.   All covenants, agreements, representations and warranties made herein, in the Loan Documents and in the Note or in certificates delivered in connection herewith by or on behalf of Borrower shall survive the issuance and delivery of the Note to Lender, the making of the Loan by Lender, and shall bind the successors and assigns of Borrower, whether so expressed or not, and all such covenants, agreements, representations and warranties shall inure to the benefit of Lender's successors and assigns, including any subsequent holder of the Note.

11.14  Notices.  All communications provided for hereunder, under the Loan Documents or under the Note shall be in writing, in the manner and to the parties as set forth in the Deed of Trust.

11.15  Law Governing; Modification.  This Agreement shall be construed in accordance with and governed by laws of the State of California.  No provision of this Agreement may be waived, changed or modified, or the discharge thereof acknowledged, orally, but only by an agreement in writing signed by the party against whom the enforcement of any waiver, change, modification or discharge is sought.

11.16  Headings.  The headings of the sections and subsections of this Agreement are inserted for convenience only and do not constitute part of this Agreement.

11.17  <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

11.18  <u>FINAL CREDIT AGREEMENT</u>.  THIS WRITTEN AGREEMENT, THE NOTE AND THE LOAN DOCUMENTS ARE THE FINAL EXPRESSION OF THE CREDIT AGREEMENT BETWEEN BORROWER AND LENDER AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR OR CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER AND LENDER.  BORROWER AND LENDER HEREBY AFFIRM THAT THERE IS NO UNWRITTEN ORAL CREDIT AGREEMENT BETWEEN BORROWER AND LENDER WITH RESPECT TO THE SUBJECT MATTER OF THIS WRITTEN CREDIT AGREEMENT, THE NOTE, THE LOAN DOCUMENTS, AND ANY RELATED LOAN DOCUMENTS.

*[Signatures follow on next pages]*

IN WITNESS WHEREOF, Borrower and Guarantors have executed this Loan Agreement, or have caused this Loan Agreement to be executed by its duly authorized representative(s) as of the day and year first written above.

BORROWER:

C & A FARMS, LLC,
a California limited liability company

By: _____
Farid Assemi, its General Manager

By: _____
Farshid Assemi, its General Manager

By: _____
Darius Assemi, its General Manager

MARICOPA ORCHARDS, LLC,
a California limited liability company

By: _____
Farid Assemi, its General Manager

By: _____
Farshid Assemi, its General Manager

By: _____
Darius Assemi, its General Manager

*[Signatures continue on following pages]*

29



GUARANTORS:

_____
FARID ASSEMI

_____
FARSHID ASSEMI

_____
DARIUS ASSEMI

*[Signatures continue on following pages]*

30

The foregoing agreement is hereby accepted as of the date first above written.

METROPOLITAN LIFE INSURANCE COMPANY,
a New York corporation


By:     MetLife Investment Management, LLC,
        its investment manager


By: _____
    Name: _Leonides A Moreno_
    Its Authorized Signatory and Director

31

SCHEDULE 4.5

| Case Name | Description |
| --- | --- |
| Assemi Brothers, LLC et al. v. Wonderful Pistachios & Almonds, LLC et al. (Fresno County Superior Court Case No. 19CECG03249) | Filed in Fresno 09/06/2019 against Wonderful; lead case alleging breach of contract and unfair competition claims against Wonderful. |
| Independent Financing Services, LLC v. Darius Assemi et al. (Fresno County Superior Court Case No. 20CECG01363) | IFS filed on 05/04/2020 pursuant to the parties 4/17/2020 stipulation to move this case from Los Angeles to Fresno. IFS seeks to accelerate repayment of an IFS loan based on the Assemi's alleged breach of contract. |
| Independent Financing Services, LLC v. Assemi Brothers, LLC (Fresno County Superior Court Case No. 20CECG01378) | IFS filed in Fresno on 05/04/2020 pursuant to the parties 4/17/2020 stipulation to move this case from Los Angeles to Fresno.  IFS seeks to accelerate repayment of an IFS loan based on the Assemi's alleged breach of contract. |
| Maricopa Orchards, LLC et al. v. Wonderful Growers Cooperative et al. (Los Angeles Superior Court Case No. 20STCP01863) | Filed in Los Angeles on 06/03/2020, seeking to exercise Assemi rights as co-op members for an accounting and records from the Wonderful pistachio and almond cooperatives and Cal Pure, which Wonderful has refused to provide. |

Schedule 4.5

EXHIBIT A

Description of Land

EXHIBIT A

The land referred to herein below is situated in the unincorporated area, County of Fresno, State of California and is described as follows:

TRACT A:

PARCEL 1:

The Southeast quarter of Section 9, Township 17 South, Range 17 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, Fresno County Records.

EXCEPTING THEREFROM all of the mineral and mineral ores of every kind and character now known to exist or hereafter discovered upon, which or underlying the hereinabove described property or that may be produced therefrom including, without limiting the generality of the foregoing, all oil, natural gas and sand, gravel and aggregates, and products derived therefrom as granted to Bravo Oil Company in Deed recorded December 29, 1965, Instrument No. 104217 in Book 5257, Page 25 of Official Records, Fresno County Records.

APN: 050-040-16s

PARCEL 2:

The Northeast quarter of Section 9, Township 17 South, Range 17 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, Fresno County Records.

EXCEPTING THEREFROM all of the mineral and mineral ores of every kind and character now known to exist or hereafter discovered upon, which or underlying the hereinabove described property or that may be produced therefrom including, without limiting the generality of the foregoing, all oil, natural gas and sand, gravel and aggregates, and products derived therefrom as granted to Bravo Oil Company in Deed recorded  December 29, 1965, Instrument No. 104217 in Book 5257, Page 25 of Official Records, Fresno County Records.

APN: 050-040-15s

PARCEL 3:

Exhibit A-1

The West half of Section 9, Township 17 South, Range 17 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM all of the mineral and mineral ores of every kind and character now known to exist or hereafter discovered upon, which or underlying the hereinabove described property or that may be produced therefrom including, without limiting the generality of the foregoing, all oil, natural gas and sand, gravel and aggregates, and products derived therefrom as granted to Bravo Oil Company in Deed recorded December 29, 1965, Instrument No. 104217 in Book 5257, Page 25 of Official Records, Fresno County Records.

APN: 050-040-17s

TRACT B:

Parcel One:

The Northwest Quarter of Section 22, Township 17 South, Range 16 East, Mount Diablo Base Meridian, in the unincorporated area, County of Fresno, State of California according the Official Plat thereof.

Excepting therefrom all oil, gas and minerals as heretofore reserved and/or granted of record.

APN: 050-070-15s

Parcel Two:

The Southeast Quarter of Section 22, Township 17 South, Range 16 East, Mount Diablo Base Meridian, in the unincorporated area, County of Fresno, State of California according to the Official Plat thereof.

Excepting therefrom the East half of the Southeast Quarter of the Southeast Quarter of Section 22, which was conveyed to Westlands Water District by Deed Recorded in Book 7412 Page 641, Official Records.

Also excepting therefrom an undivided three-fourths interest in and to all minerals, oil, gas and other similar substances contained therein, together with the right at any and all times to enter upon said property either in person or by representatives, as reserved in the Deed from Loren C. Rigby, Executor of the Will of Myra L. Gibson, Deceased, to Five Points Ranch Inc., a corporation, dated June 15, 1962, recorded July 2, 1962 in Book 4737 Page 235 of Official Records, Document No. 51617.

Exhibit A-2

Also excepting therefrom all Grantors interest in and to all oil, gas, minerals and other hydrocarbon substances in and under said land as reserved by Harold D. Burford, et al, in the Deed Recorded November 23, 1983 as Document No. 83109958, Official Records.

APN: 050-070-29s

Parcel Three:

The Northeast Quarter of Section 22, Township 17 South, Range 16 East, Mount Diablo Base Meridian, in the unincorporated area, County of Fresno, State of California according the Official Plat thereof.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land as heretofore reserved and/or granted of record.

APN: 050-070-18s

Exhibit A-3

EXHIBIT B
SCHEDULED LIENS AND LEASES

1. Agricultural Lease dated as of April 2, 2021 between Maricopa Orchards, LLC, a California limited liability company, as landlord, and Dumar, LLC, a California limited liability company, as Tenant.

2. Agricultural Lease dated as of April 2, 2021 between Maricopa Orchards, LLC, a California limited liability company, as landlord, and Pistache, LLC, a California limited liability company, as Tenant.

Exhibit B

EXHIBIT C
AFFILIATE DEBT

1.  That certain Unsecured Revolving Promissory Note dated February 16, 2020 between
    Assemi Brothers, LLC, a California limited liability company as "Borrower" and
    Maricopa Orchards, LLC, a California limited liability company as "Lender" in the
    amount of $75,000,000.00.

Exhibit C