COMPLAINT EXHIBIT 6

Loan No. 201755

## UNSECURED ENVIRONMENTAL INDEMNITY AGREEMENT

This agreement is dated as of April 2, 2021, and is by C & A FARMS, LLC, a California limited liability company, and MARICOPA ORCHARDS, LLC, a California limited liability company (together, and jointly and severally, "**Borrower**"), FARID ASSEMI, a married man, FARSHID ASSEMI, a married man, and DARIUS ASSEMI (a/k/a Dariush Assemi), an unmarried man (collectively, and jointly and severally, "**Guarantor**") (Borrower and Guarantor are collectively referred to herein as "**Indemnitor**") in favor of METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation ("**Indemnitee**").

Indemnitee has agreed to make a loan (the "**Loan**") to Borrower under the terms and conditions of the Promissory Note by Borrower in favor of Indemnitee dated as of the date of this agreement (the "**Note**"). The Loan is guaranteed by Guarantor under the terms of certain Loan Guaranty Agreements made by Guarantor dated as of even date herewith.

As a condition to making the Loan, Indemnitee requires that Indemnitor enter into this agreement for the purpose of, without limitation, indemnifying and holding Indemnitee harmless from and against losses incurred by Indemnified Persons as a result of environmental matters relating to the real estate described on EXHIBIT A (the "**Mortgaged Land**").

To induce Indemnitee to make the Loan to Borrower, and in consideration thereof, Indemnitor agrees:

     1.    Representations. Covenants and Indemnification.

Representations. To its actual knowledge, Indemnitor represents and warrants to Indemnitee that: (1) Indemnitor has complied and caused the Mortgaged Land to comply with all Environmental Laws, including but not limited to obtaining any necessary Environmental Permits, relating to the Mortgaged Land; (2) there are no existing, pending, or threatened Environmental Claims against Indemnitor relating to the Mortgaged Land; (3) neither Indemnitor nor to the knowledge of Indemnitor any agent, affiliate, tenant, or partner of Indemnitor has received any notices of and does not otherwise have any notice of an Environmental Claim regarding the Mortgaged Land nor any other action, proceeding or investigation by any Governmental Authority or third party under any Environmental Laws or Environmental Permits relating to the Mortgaged Land; (4) any environmental questionnaire, if any, prepared by Indemnitor and submitted to Indemnitee is true and accurate as of the date of this agreement; (5) the Mortgaged Land does not contain any facility that is subject to reporting under Section 312 of the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. 11022); (6) the Mortgaged Land is not listed on the Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) in accordance with Section 116 of CERCLA (42 U.S.C. 9616); (7) no portion of the Mortgaged Land contains or is located within 2000 feet of a significant disposal of hazardous waste within the meaning of California Health and Safety Code §25221 (the "**Code**") that could cause the Mortgaged Land to be classified as a hazardous waste

1

property or border zone property under the Code; (8) other than the presence, use, storage and disposal of Hazardous Materials in quantities as necessary for Indemnitor's normal farming operations located on the Mortgaged Land, all of which Indemnitor covenants have and will be used, stored and disposed of in accordance with commercially reasonable farming practices and all applicable Environmental Laws, Indemnitor has no actual knowledge of the presence of any Hazardous Materials on the Mortgaged Land; (9) Indemnitor has no knowledge of any Release of Hazardous Materials on, under, from, or affecting the Mortgaged Land, other than the application of crop fertilizers and agricultural chemicals in accordance with Applicable Law and the manufacturer's label instructions; (10) except as disclosed to Indemnitee in writing, prior to the date of this agreement, Indemnitor has no knowledge of any underground storage tanks or landfills located on the Mortgaged Land; and (11) Indemnitor has provided Indemnitee with all environmental reports and site assessments in the custody or control of Indemnitor relating to the Mortgaged Land.

Covenants.   Indemnitor covenants and agrees as follows:   (1) Indemnitor shall keep the Mortgaged Land or cause the Mortgaged Land to be kept free of asbestos and asbestos-containing construction materials; (2) Indemnitor shall not use, transport, store, treat, generate, handle or dispose of, or in any manner deal with, and shall ensure that no occupant of the Mortgaged Land uses, transports, stores, treats, generates, handles or disposes of, or in any manner deals with, Hazardous Materials on, in, at, about, or from the Mortgaged Land, except in compliance with all applicable federal, state, and local laws, ordinances, rules and regulations, including Environmental Laws; (3) Indemnitor shall not cause and shall ensure that no occupant of the Mortgaged Land causes the Mortgaged Land to become subject to regulation as a hazardous waste treatment, storage, or disposal facility under Environmental Laws; (4) Indemnitor shall comply with, and ensure compliance by all occupants of the Mortgaged Land with, all Environmental Laws, and shall keep the Mortgaged Land free and clear of any liens imposed pursuant to any Environmental Laws; (5) Indemnitor shall immediately notify Indemnitee if Indemnitor receives any notice or advice from any Governmental Authority or any source whatsoever of any: (A) Release of Hazardous Materials, on, under, from, or affecting the Mortgaged Land, which could require remediation or reporting under Environmental Laws; (B) enforcement action or threat of enforcement action by any Governmental Authority with respect to Hazardous Materials in, on, under, from or affecting the Mortgaged Land or relating to Indemnitor's property, activities or operations generally; (C) Environmental Claim; (D) requirement of Indemnitor or any occupant of the Mortgaged Land to obtain an Environmental Permit other than permits required in the ordinary course of farming operations of the nature or manner occurring on the Mortgaged Land, provided that Indemnitor shall provide such permits promptly upon Indemnitee's request; or (E) requirement of Indemnitor or any occupant of the Mortgaged Land to obtain a permit or license with respect to exploration, mining, extraction, storage, transportation, processing or sale of coal, oil, gas or any other minerals on or under the Mortgaged Land; (6) promptly upon receipt, Indemnitor shall deliver to Indemnitee copies of all notices, orders, or other communications regarding any event described in clauses (5)(A) through (E) above; (7) except as specifically disclosed to Indemnitee in writing, prior to the date of this agreement, Indemnitor shall not allow to exist on, under, or about the Mortgaged Land any

2

underground storage tanks; and with respect to such underground storage tanks, previously disclosed to Indemnitee in writing, all such underground storage tanks shall be operated and maintained in accordance with all Environmental Laws; and (8) upon an Event of Default, then without any notice or further action Indemnitee may in its sole discretion enter the Mortgaged Land to perform or have performed investigation of the Mortgaged Land for the presence of Hazardous Materials. Such investigation may include but is not limited to the conduct of a Phase I and/or Phase II Environmental Report including any surface or subsurface sampling and analysis of soil, groundwater, sediment and/or surface water. Indemnitor shall cooperate fully with Indemnitee with respect to any such investigation by Indemnitee.

Environmental Report. If Indemnitee has received information indicating a reasonable possibility of the presence of Hazardous Materials on the Mortgaged Land in violation of Environmental Laws, Indemnitor shall provide at its sole cost and expense within 20 days after written request by Indemnitee, a Phase I Environmental Assessment from a qualified engineering firm or other qualified consultant acceptable to Indemnitee with respect to an investigation and audit of the Mortgaged Land as deemed necessary by the consultant to enable the consultant to report that there is no apparent or likely Hazardous Materials on the Mortgaged Land that violate Environmental Laws; and Indemnitor shall, if deemed reasonably necessary to further investigate suspected or likely contamination, provide Indemnitee with supplemental reports by acceptable qualified consultants of the analysis which may include surface and subsurface sampling and analysis of soil, sediment, surface water and/or groundwater from the Mortgaged Land, showing no Hazardous Materials present on the Mortgaged Land in violation Environmental Laws (any such audit, and any supplemental reports, an **"Environmental Report"**). If Indemnitor does not comply with the requirements of this Section within such 20 day period, or such additional time commercially reasonable as Indemnitee shall agree to in writing, or if Indemnitee is not reasonably satisfied with the results of any of the conclusions in the Environmental Report, then Indemnitee may perform or cause to be performed such additional investigations (including surface and subsurface testing of soil, groundwater, surface water and sediment) as Indemnitee deems appropriate. Indemnitor consents to Indemnitee entering the Mortgaged Land to the extent required to perform and to Indemnitee performing such additional investigations, without the need for further action.

Remedial Work. If any investigation, monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (**"Remedial Work"**) is deemed by Indemnitee to be necessary pursuant to Environmental Laws or with respect to Environmental Claims, Indemnitor will within 30 days after written demand for performance thereof by Indemnitee (or such shorter period of time as required under Applicable Law), begin and thereafter complete, all such Remedial Work. All Remedial Work shall be approved in advance in writing by Indemnitee. All Costs related to such Remedial Work shall be paid by Indemnitor including Costs incurred by Indemnitee in connection with monitoring or review of such Remedial Work. If Indemnitor fails to promptly commence or fails to complete such Remedial Work, Indemnitee may, but shall not be required to, cause such Remedial Work to be performed and all Costs shall become an Environmental Claim hereunder. If there is an emergency, Indemnitor shall immediately commence the Remedial Work and thereafter give immediate notice to Indemnitee.

3

<u>INDEMNITY</u>.   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW INDEMNITOR AGREES TO INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS INDEMNIFIED PERSONS (DEFINED BELOW) FROM AND AGAINST ANY AND ALL COSTS SUFFERED, IMPOSED ON, OR INCURRED BY INDEMNIFIED PERSONS OR ASSERTED AGAINST INDEMNIFIED PERSONS, WHICH DIRECTLY OR INDIRECTLY ARISE OUT OF OR RESULT FROM:   (1) THE PRESENCE OR EXISTENCE OF HAZARDOUS MATERIALS AT, ON, ABOUT, UNDER, WITHIN, NEAR OR IN CONNECTION WITH THE MORTGAGED LAND; (2) THE INACCURACY OF ANY OF THE REPRESENTATIONS OF INDEMNITOR CONTAINED IN THIS AGREEMENT; (3) ANY ENVIRONMENTAL CLAIM; (4) ANY BREACH BY INDEMNITOR OF ANY OF ITS COVENANTS OR AGREEMENTS IN THIS AGREEMENT; AND (5) ANY CLAIM, DEMAND OR CAUSE OF ACTION, OR ANY ACTION OR OTHER PROCEEDING, WHETHER MERITORIOUS OR NOT, BROUGHT OR ASSERTED AGAINST INDEMNIFIED PERSONS WHICH RELATES TO, ARISES FROM OR IS BASED ON ANY OF THE MATTERS DESCRIBED IN CLAUSES (1) THROUGH (5) OF THIS SECTION, OR ANY ALLEGATION OF ANY SUCH MATTERS (collectively, the "**Indemnified Matters**"). The indemnification provided in this Section applies to and includes Costs due to Environmental Claims brought by or on behalf of employees of Indemnitor.  This agreement does not limit any rights or remedies, including the right to contribution, which any Indemnified Person may have against Indemnitor or any other party under any federal, state or local laws.

2.      <u>General Terms and Conditions</u>.

<u>Payment on Demand; Interest</u>.  All amounts required to be paid by Indemnitor to Indemnified Persons under the terms of this agreement will be due and payable upon demand, and will bear interest from the date of any payment thereof by Indemnified Persons, until paid by Indemnitor, at a rate per annum equal to (1) if Indemnitee is the holder of the Note, the Default Interest Rate (as defined in the Note); and (2) if Indemnitee is no longer the holder of the Note, the lesser of (A) 16.000% per annum; or (B) the maximum rate then permitted under Applicable Law.

<u>Unsecured Obligations</u>.  Notwithstanding any provision to the contrary in the Loan Documents, the Indemnity Obligations are not secured by any lien or security interest in real estate or personal property.

<u>Environmental Claim Proceeding</u>.  Indemnitee may join and participate in, as a party if it so elects, any legal proceedings or actions initiated by Indemnitor or against Indemnitor or the Mortgaged Land, in connection with any Environmental Law.   In connection with any Environmental Claim, Indemnified Persons may, but shall not be obligated to, employ their own legal counsel and consultants to investigate, prosecute, negotiate, or defend any such Environmental Claim or matter, and Indemnified Persons shall have the right to compromise or settle the same without showing actual liability therefor, and without the consent of Indemnitor. Provided, however, Indemnitor shall not, without the prior written consent of Indemnitee, in any circumstance in which this Agreement applies (1) settle or compromise any action, suit, proceeding, or claim or consent to the entry of any judgment that does not include as an

4

unconditional term thereof the delivery by the claimant or plaintiff to Indemnitee of (A) a full and complete written release of Indemnified Persons (in form, scope and substance satisfactory to Indemnitee) from all liability in respect of such action, suit or proceeding and (B) a dismissal with prejudice of such suit, action or proceeding; or (2) settle or compromise any action, suit, proceeding, or claim in any manner that may adversely affect Indemnified Persons as determined by Indemnitee. All Professional Fees and other expenses incurred by Indemnitee in connection with the exercise of its rights and remedies under this agreement will constitute an Environmental Claim.

INDEPENDENT OBLIGATIONS. THE RIGHTS OF INDEMNIFIED PERSONS ARE IN ADDITION TO ALL OTHER RIGHTS AND REMEDIES OF INDEMNIFIED PERSONS UNDER THE LOAN DOCUMENTS, OR ANY OTHER DOCUMENT OR INSTRUMENT NOW OR HEREAFTER EXECUTED BY INDEMNITOR, OR AT LAW OR IN EQUITY (INCLUDING ANY RIGHT OF REIMBURSEMENT OR CONTRIBUTION PURSUANT TO CERCLA). INDEMNIFIED PERSONS MAY BRING A SEPARATE ACTION, OR COMMENCE A SEPARATE REFERENCE OR ARBITRATION PROCEEDING AGAINST ANY INDEMNITOR WITHOUT FIRST PROCEEDING AGAINST ANY OTHER INDEMNITOR, IF ANY, ANY OTHER PERSON OR ANY SECURITY THAT INDEMNIFIED PERSONS MAY HOLD, AND WITHOUT PURSUING ANY OTHER REMEDY.

SURVIVAL OF OBLIGATIONS. SUBJECT TO THE PROVISIONS SET FORTH BELOW, THE RIGHTS OF INDEMNIFIED PERSONS UNDER THIS AGREEMENT WILL SURVIVE (1) THE PAYMENT IN FULL OF ALL INDEBTEDNESS (AS DEFINED IN THE LOAN AGREEMENT), (2) THE RELEASE OF THE MORTGAGED LAND FROM THE LIEN OF THE DEED OF TRUST (AS DEFINED IN THE LOAN AGREEMENT), (3) A FORECLOSURE TRANSFER, OR (4) ANY ASSIGNMENT OF ALL OR ANY OF INDEMNITEE'S RIGHTS UNDER THE LOAN DOCUMENTS. Notwithstanding any other provision of this agreement to the contrary, Indemnitor will not be liable to Indemnified Persons for Indemnified Matters, if such Indemnified Matters result directly and solely from (A) the gross negligence or willful misconduct of Indemnified Persons, or (B) other events or circumstances not first occurring or present until a time subsequent to the earlier of (X) the payment in full of all Indebtedness (as defined in the Loan Agreement) or (Y) a Foreclosure Transfer.

Revival and Reinstatement. If Indemnified Persons are required to pay, return or restore to Indemnitor or any other Person any amounts previously paid under the terms of this agreement because of any Insolvency Proceeding of Indemnitor or such other Person, any stop notice or any other reason, the obligations of Indemnitor shall be reinstated and revived and the rights of Indemnified Persons shall continue with regard to such amounts, all as though they had never been paid.

Notices. All requests, notices, approvals, consents, and other communications between Indemnitor and Indemnified Persons (individually and collectively, "**Notices**") under this agreement must be in writing and mailed or delivered, if to any Indemnitor, at 1306 W. Herndon

5

Avenue, Suite 101, Fresno, California 93711, Attn: Legal Department; if to Indemnitee or any other Indemnified Person, at Metropolitan Life Insurance Company, c/o MetLife Investment Management, LLC, 10801 Mastin Blvd., Suite 700, Overland Park, KS 66210, Attn: Director, and a copy to [Metropolitan Lender Entity], c/o MetLife Investment Management, LLC, Agricultural Investments, 10801 Mastin Blvd., Suite 700, Overland Park, KS 66210, Attn:  Law Department, and a copy to Metropolitan Life Insurance Company, c/o MetLife Investment Management, LLC, Agricultural Investments, 205 E. River Park Circle, Suite 430, Fresno, CA 93720, Attn: Director, WRO, or to the address designated by any party to this agreement in a notice to the other parties.  All Notices will be deemed to be given or made upon the earlier to occur of:  (1) actual receipt by the intended recipient; (2) if delivered by hand or by courier, upon delivery; or (3) if delivered by mail, four Business Days after deposit in the U.S. mail, properly addressed, postage prepaid; except that notices and other communications to Indemnitee will not be effective until actually received by Indemnitee.

<u>Defined Terms</u>.  Except as otherwise expressly provided herein, capitalized terms used in this agreement will have the respective meanings assigned to such terms below

"**Affiliate**" of a Person other than an individual means another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.   Unless otherwise specified, all references to an "Affiliate" or to "Affiliates" refer to any Affiliate or Affiliates, if any.

"**Applicable Law**" means all existing and future laws, orders, ordinances, rules and regulations of or by a Governmental Authority.

"**Costs**" shall mean all liabilities, losses, charges, costs, damages (including foreseeable and unforeseeable consequential damages), debts, reasonable expenses, claims, and Professional Fees of any kind or of any nature whatsoever.  For the purposes of this definition, such losses, costs and damages shall include remedial, removal, response, abatement, cleanup, legal, investigative and monitoring costs and related costs, expenses, losses, damages, penalties, fees, fines, obligations, defenses, judgments, awards, actions, suits, proceedings, disbursements and amounts paid in settlement, of whatever kind or nature.

"**Drafting Conventions**" means the rules on interpretation specified in the section of this agreement captioned "Drafting Conventions."

"**Event of Default**" means an "Event of Default" as that term is defined in the Loan Agreement, and in addition, any default in the payment, performance or otherwise of any term, covenant, condition or obligation of Indemnitor under this agreement, which is not cured within any applicable cure or grace period as provided for in the Loan Agreement, if any.

"**Environmental Claim**" includes, but is not limited to, any claim, demand, action, cause of action, suit, loss, cost, damage, fine, penalty, expense, liability, judgment, proceeding, or injury, whether threatened, sought, brought, or imposed, that seeks to impose Costs, directly or indirectly related to the Mortgaged Land for (1) noise; (2) pollution or contamination of the air, surface water, ground water, drinking water, soil or soil vapor; (3) generation, handling,

6

collection, treatment, management, storage, disposal or transportation of solid, gaseous, or liquid waste; (4) injection, withdrawal, generation, handling, collection, treatment, management, storage, disposal or transportation of process water, flowback water or fluids, produced water, wastewater, groundwater, surface water or stormwater; (5) the exposure to, presence or alleged Release of Hazardous Materials, on, under, from, or affecting the Mortgaged Land, whether or not known to Indemnitor, regardless of the source of such exposure, presence or Release, or except as expressly provided in this agreement, regardless of when such exposure, Release or presence occurred; (6) the manufacture, processing, distribution in commerce, use, or storage of Hazardous Materials; (7) the exploration, mining, extraction, or processing of coal, oil, gas, or other minerals; (8) the drilling, installation, construction, maintenance, operation and existence of any wells on or under the Mortgaged Land; (9) injury to or death of any Person or Persons directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land; (10) destruction or contamination of any property directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land; (11) pollution, contamination, or degradation of the quality of drinking waters or public water supplies; (12) the removal of Hazardous Materials from the Mortgaged Land or the taking of necessary precautions to protect against the Release of Hazardous Materials on, under or from the Mortgaged Land; (13) compliance with all Environmental Laws and Environmental Permits and/or any asserted breach or violation of any Environmental Laws or Environmental Permits; (14) any restriction on use, ownership, occupation, or transferability of the Mortgaged Land as a result of Hazardous Materials; (15) the maintenance of a private or public nuisance, trespass, or the conducting of an abnormally dangerous activity on or near the Mortgaged Land, in each case arising from or in connection with Hazardous Materials; (16) any remedial, response, abatement, cleanup, investigative and monitoring work in connection with any Hazardous Materials or as required by any Environmental Laws; or (17) any and all fines or penalties directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land.

"**Environmental Law**" or "**Environmental Laws**" means all requirements of environmental or ecological laws or regulations or controls related to the Mortgaged Land, including all requirements imposed by any Applicable Law of any Governmental Authority or any private agreement (such as covenants, conditions and restrictions), which relate to (1) noise; (2) pollution or protection of the air, surface water, ground water, drinking water, soil or soil vapor; (3) solid, gaseous, or liquid waste generation, handling, collection, treatment, management, storage, disposal, or transportation; (4) exposure to Hazardous Materials; (5) regulation of the manufacture, processing, distribution and commerce, use, or storage of Hazardous Materials, (6) injection, withdrawal, generation, handling, collection, treatment, management, storage, disposal, or transportation of process water, flowback water or fluids, produced water, wastewater, groundwater, drinking water, surface water or stormwater; or (7) the exploration, mining, extraction, or processing of coal, oil, gas, or other minerals.

"**Environmental Permit**" means any permit, license, approval, or other authorization with respect to any activities, operations, or businesses conducted on, under or in relation to the Mortgaged Land obtained or required in connection with any Environmental Law.

7

**"Foreclosure Transfer"** means with respect to any Mortgaged Land, the transfer of title to that Mortgaged Land pursuant to judicial decree, the power of sale or other judicial or non-judicial action or proceeding to foreclose the interests of Indemnitee under the Loan Documents in the Mortgaged Land, or by deed in lieu of such foreclosure.

**"Governmental Authority"** means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

**"Hazardous Materials"** means:   (1) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*) ("**CERCLA**"), as amended by Superfund Amendments and Reauthorization Act of 1986 (Pub. L. 99-499 100 Stat. 1613) ("**SARA**"), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*) ("**RCRA**"), and the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 *et seq.*, and those substances included in the definitions of "hazardous air pollutant" under the federal Clean Air Act (42 U.S.C. Section 701, *et seq.*), or "extremely hazardous substance" or "toxic chemical' under the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001, *et seq.*), and in the regulations promulgated pursuant to said laws, all as amended; (2) those substances listed in the U.S. Department of Transportation Table (49 CFR 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto); (3) any material, waste or substance which is or are: (A) petroleum, (B) asbestos, (C) polychlorinated biphenyls, (D) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (33 U.S.C. § 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. § 1317); (E) designated as a "pollutant" pursuant to Section 502(6) of the Clean Water Act (33 U.S.C. § 1362(6); (F) flammable explosives; or (G) radioactive materials; and (4) such other substances, materials and wastes which are or become classified or regulated as hazardous or toxic under Applicable Law or by any Governmental Authority, including mold, radon, radionuclides, heavy metals or other potentially naturally-occurring minerals or substances.

**"Indemnified Persons"** means Indemnitee, Indemnitee's Subsidiaries and Affiliates and all of their officers, directors, agents, employees, servants, attorneys, and representatives.

**"Indemnity Obligations"** means the indebtedness, liabilities and obligations of Indemnitor to Indemnified Persons under the terms of this agreement.

**"Insolvency Proceeding"** means the insolvency of a Person, the appointment of a receiver of any part of a Person's property, an assignment by a Person for the benefit of creditors, or the commencement of any proceeding under the Federal Bankruptcy Code or any other bankruptcy or insolvency law, by or against a Person.

8

**"Legal Fees"** means all counsel, attorney, paralegal and law clerk fees and disbursements including, but not limited to fees and disbursements at the pre-trial, trial, appellate, discretionary review, or any other level.

**"Loan Documents"** shall have the meaning provided in the Loan Agreement, provided that notwithstanding anything to the contrary in the Loan Documents as defined therein, the term Loan Documents does not include this agreement.

**"Person"** means an individual, a corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or other business entity, or a government or any agency or political subdivision thereof.

**"Professional Fees"** means: Legal Fees; and all other fees and disbursements of environmental engineers and other third party consultants or professionals associated with the enforcement of Indemnitee's rights and remedies under this agreement.

**"Release"** means any discharging, disposing, emitting, leaking, pumping, pouring, emptying, injecting, escaping, leaching, dumping or spilling (including the abandonment or discarding of barrels, containers and other closed receptacles) into ambient air, surface water, ground water, soil, or soil vapor.

**"Subsidiary"** of a Person which is anything other than an individual means a business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly by that Person. Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" refer to any Subsidiary or Subsidiaries, if any.

<u>Drafting Conventions</u>. Evidence of the occurrence or non-occurrence of any event, or the existence or non-existence of any circumstance to be delivered to Indemnitee must be in a form satisfactory to Indemnitee; and any report or document to be received by Indemnitee must be in form and content satisfactory to Indemnitee. Wherever: (1) Indemnitee exercises any right given to it to approve or disapprove; (2) any arrangement or term is to be satisfactory to Indemnitee; or (3) any other decision or determination is to be made by Indemnitee, then except as may be otherwise expressly and specifically provided therein, the decision to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Indemnitee, will be in the sole discretion of Indemnitee. The words **"include,"** **"includes,"** and **"including"** are to be read as if they were followed by the phrase "without limitation"; headings and captions are provided for convenience only and do not affect the meaning of the text which follows; and the definitions in this agreement apply equally to both singular and plural forms of the terms defined.

<u>General</u>. This agreement may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same agreement. Indemnitee may make an optically imaged reproduction of this agreement and, at its election, destroy the original or originals. Indemnitor consents to the destruction of the original or originals and agrees that a

9

copy of the optically imaged reproduction of this agreement will be the equivalent of and for all purposes constitute an "original" document. No provision or waiver in this agreement shall be construed as limiting the generality of any other provision or waiver contained in this agreement. Each party to this agreement has participated in negotiating and drafting this agreement, so if an ambiguity or a question of intent or interpretation arises, this agreement is to be construed as if the parties had drafted it jointly, as opposed to being construed against a party because it was responsible for drafting one or more provisions of this agreement. This agreement will inure to the benefit of and shall be binding upon the parties and their respective successors and assigns; provided, that Indemnitor shall not assign its rights or obligations hereunder without Indemnitee's consent. Indemnitee may transfer all or any portion of its rights under this agreement to any other Person to whom Indemnitee assigns its rights under the Loan Documents; provided, however, that Indemnitee is under no obligation to make such assignment upon the assignment of its rights under the Loan Documents. All rights and remedies under this agreement and the Loan Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies. Any provision of this agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this agreement or affecting the validity or enforceability of that provision in any other jurisdiction. This agreement may not be amended, changed, modified, altered or terminated without the prior written consent of Indemnitor. This agreement: (1) represents the sum of the understandings and agreements between Indemnitee and Indemnitor related to the Mortgaged Land concerning the subject of an unsecured environmental indemnity agreement separate from and in addition to the indebtedness, liabilities and obligations of Indemnitor under the Loan Documents (a "**Separate Environmental Indemnity**"); (2) replaces any prior agreements between Indemnitee and Indemnitor concerning the subject of a Separate Environmental Indemnity; and (3) is intended by Indemnitee and Indemnitor as the final, complete and exclusive statement of the terms agreed to by them with respect to a Separate Environmental Indemnity.

Governing Law/Jurisdiction and Venue. This agreement shall be governed exclusively by the laws of the State of California without regard or reference to its conflict of laws principles. INDEMNITOR AND INDEMNITEE IRREVOCABLY AGREES THAT ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY LOAN DOCUMENT WILL BE LITIGATED IN THE DISTRICT COURT IN AND FOR THE COUNTY IN WHICH THE MORTGAGED LAND IS LOCATED, OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CALIFORNIA IN WHICH SUCH COUNTY IS LOCATED. INDEMNITOR AND INDEMNITEE IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

Joint and Several Obligations. If Indemnitor consists of more than one Person, each Indemnitor (1) acknowledges that this agreement is the independent and several obligation of each Indemnitor and may be enforced against each Indemnitor separately, whether or not enforcement

10

of any right or remedy hereunder has been sought against any other Indemnitor; and (2) agrees that its liability under this agreement shall be absolute, unconditional, continuing and irrevocable. INDEMNITOR WAIVES ANY REQUIREMENT THAT INDEMNITEE EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST ANY OTHER INDEMNITOR UNDER THIS AGREEMENT OR AGAINST ANY OTHER PERSON UNDER ANY AGREEMENT OF, OR SECURITY FOR, ANY OF THE INDEMNITY OBLIGATIONS.

Obligations of Married Persons. Any Indemnitor who is a married Person signs this agreement on his or her own behalf and on behalf of Indemnitor's marital community, if any and agrees that recourse may be had against community assets, if any, and against Indemnitor's separate property for the satisfaction of all Indemnity Obligations.

Successive Actions. To the extent permitted by Applicable Law, separate and successive actions may be brought hereunder to enforce any of the provisions of this agreement. No action hereunder shall prevent a subsequent action, and Indemnitor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

Waiver. Indemnitor: (1) waives any right or claim of right to cause a marshaling of the assets of Indemnitor or to cause Indemnified Persons to proceed against any of the security for the Loan before proceeding under this agreement against Indemnitor; and (2) waives and relinquishes all rights and remedies accorded by Applicable Law to indemnitors or guarantors, except any rights of subrogation that Indemnitor may have; provided that the indemnity provided for hereunder shall neither be contingent upon the existence of any such rights of subrogation nor subject to any claims or defenses whatsoever that may be asserted in connection with the enforcement or attempted enforcement of such subrogation rights, including any claim that such subrogation rights were abrogated by any acts or omissions of Indemnified Persons.

Waiver of Right of Contribution. If Indemnitor is comprised of more than one Person, each such Person agrees that it will have no right of contribution (including any right of contribution under CERCLA) or subrogation against any other Person comprising Indemnitor under this agreement unless and until all Indemnity Obligations have been satisfied. Each such Person further agrees that, to the extent that the waiver of its rights of subrogation and contribution in this agreement is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation or contribution that Person may have will be junior and subordinate to the rights of Indemnitee against Indemnitor under this agreement.

**WAIVER OF TRIAL BY JURY. INDEMNITOR BY EXECUTION AND DELIVERY OF THIS AGREEMENT TO INDEMNITEE, AND INDEMNITEE, BY ACCEPTANCE OF THIS AGREEMENT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (1) THIS AGREEMENT; OR (2) ANY INDEMNITY OBLIGATION, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY**

11

**CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY; AND ARE A MATERIAL INDUCEMENT FOR INDEMNITEE ENTERING INTO THE NOTE AND OTHER LOAN DOCUMENTS.**

[*Signatures follow on next pages*]

12

Unsecured Environmental Indemnity Agreement
Dumar and Pistache Ranches
Loan No. 201755
110114300.2 0053564-00511

IN WITNESS WHEREOF, Indemnitor has executed this Agreement as of the date first set forth above.

INDEMNITOR:

BORROWER:

C & A FARMS, LLC,
a California limited liability company

By: _____
Farid Assemi, its General Manager

By: _____
Farshid Assemi, its General Manager

By: _____
Darius Assemi, its General Manager

MARICOPA ORCHARDS, LLC,
a California limited liability company

By: _____
Farid Assemi, its General Manager

By: _____
Farshid Assemi, its General Manager

By: _____
Darius Assemi, its General Manager

*[Signatures continue on following pages]*

13

GUARANTOR:

_____
FARID ASSEMI

_____
FARSHID ASSEMI

_____
DARIUS ASSEMI

14

Unsecured Environmental Indemnity Agreement
Dumar and Pistache Ranches
Loan No. 201755
110114300.2 0053564-00511

## EXHIBIT A

The land referred to herein below is situated in the unincorporated area, County of Fresno, State of California and is described as follows:

TRACT A:

PARCEL 1:

The Southeast quarter of Section 9, Township 17 South, Range 17 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, Fresno County Records.

EXCEPTING THEREFROM all of the mineral and mineral ores of every kind and character now known to exist or hereafter discovered upon, which or underlying the hereinabove described property or that may be produced therefrom including, without limiting the generality of the foregoing, all oil, natural gas and sand, gravel and aggregates, and products derived therefrom as granted to Bravo Oil Company in Deed recorded December 29, 1965, Instrument No. 104217 in Book 5257, Page 25 of Official Records, Fresno County Records.

APN: 050-040-16s

PARCEL 2:

The Northeast quarter of Section 9, Township 17 South, Range 17 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, Fresno County Records.

EXCEPTING THEREFROM all of the mineral and mineral ores of every kind and character now known to exist or hereafter discovered upon, which or underlying the hereinabove described property or that may be produced therefrom including, without limiting the generality of the foregoing, all oil, natural gas and sand, gravel and aggregates, and products derived therefrom as granted to Bravo Oil Company in Deed recorded  December 29, 1965, Instrument No. 104217 in Book 5257, Page 25 of Official Records, Fresno County Records.

APN: 050-040-15s

PARCEL 3:

The West half of Section 9, Township 17 South, Range 17 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM all of the mineral and mineral ores of every kind and character now known to exist or hereafter discovered upon, which or underlying the hereinabove described

Exhibit A-1

property or that may be produced therefrom including, without limiting the generality of the foregoing, all oil, natural gas and sand, gravel and aggregates, and products derived therefrom as granted to Bravo Oil Company in Deed recorded December 29, 1965, Instrument No. 104217 in Book 5257, Page 25 of Official Records, Fresno County Records.

APN: 050-040-17s

TRACT B:

Parcel One:

The Northwest Quarter of Section 22, Township 17 South, Range 16 East, Mount Diablo Base Meridian, in the unincorporated area, County of Fresno, State of California according the Official Plat thereof.

Excepting therefrom all oil, gas and minerals as heretofore reserved and/or granted of record.

APN: 050-070-15s

Parcel Two:

The Southeast Quarter of Section 22, Township 17 South, Range 16 East, Mount Diablo Base Meridian, in the unincorporated area, County of Fresno, State of California according to the Official Plat thereof.

Excepting therefrom the East half of the Southeast Quarter of the Southeast Quarter of Section 22, which was conveyed to Westlands Water District by Deed Recorded in Book 7412 Page 641, Official Records.

Also excepting therefrom an undivided three-fourths interest in and to all minerals, oil, gas and other similar substances contained therein, together with the right at any and all times to enter upon said property either in person or by representatives, as reserved in the Deed from Loren C. Rigby, Executor of the Will of Myra L. Gibson, Deceased, to Five Points Ranch Inc., a corporation, dated June 15, 1962, recorded July 2, 1962 in Book 4737 Page 235 of Official Records, Document No. 51617.

Also excepting therefrom all Grantors interest in and to all oil, gas, minerals and other hydrocarbon substances in and under said land as reserved by Harold D. Burford, et al, in the Deed Recorded November 23, 1983 as Document No. 83109958, Official Records.

APN: 050-070-29s

Exhibit A-2

Parcel Three:

The Northeast Quarter of Section 22, Township 17 South, Range 16 East, Mount Diablo Base Meridian, in the unincorporated area, County of Fresno, State of California according to the Official Plat thereof.

Excepting therefrom all oil, gas, minerals and other hydrocarbon substances in and under said land as heretofore reserved and/or granted of record.

APN: 050-070-18s

Exhibit A-3

Unsecured Environmental Indemnity Agreement
Dumar and Pistache Ranches
Loan No. 201755
110114300.2 0053564-00511